1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: FIRST AMERICAN HOME BUYERS PROTECTION CORPORATION CLASS ACTION LITIGATION | Lead Case No. 13-cv-01585-BAS(JLB)<br><br>**ORDER:**<br><br>**(1)  DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF NO. 121);**<br><br>**(2)  DENYING MOTION FOR SANCTIONS (ECF NO. 132); AND**<br><br>**(3)  DENYING *EX PARTE* MOTIONS RE: SUPPLEMENTAL AUTHORITY (ECF NOS. 139, 145, 146)** |

Plaintiffs Nancy Carrera, Anna Hershey, Emily Diaz, Brent Morrison, and Karene Jullien (collectively, "Plaintiffs") filed a Consolidated Class Action Complaint against defendant First American Home Buyers Protection Company ("Defendant" or "First American") on October 9, 2014 alleging: (1) tortious breach of the implied covenant of good faith and fair dealing; (2) violation of California Civil Code § 1710(1) (intentional misrepresentation); (3) violation of California Civil Code § 1710(2) (negligent misrepresentation); (4) violation of California Civil Code §

1710(3) (fraud by concealment); (5) violation of California Civil Code § 1710(4); (6) violation of California Business and Professions Code §§ 17200, *et seq*. (the "UCL"); (7) false advertising; (8) breach of contract;[1] and (9) declaratory relief.  (ECF No. 115 ("Consol. Compl.").)

On November 24, 2014, Plaintiffs filed a motion to certify the following class pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3):

> All persons who purchased or were listed as the named insured on a home protection contract issued by Defendant First American Home Buyers Protection Corporation from March 6, 2003 to the present.

(ECF No. 121-1 ("Mot.") at pp. 2, 16, n. 8.)  Plaintiffs seek certification of the class for the following claims: (1) intentional misrepresentation; (2) negligent misrepresentation; (3) fraud by concealment; (4) promissory fraud; (5) violation of the UCL; and (6) false advertising.  (*Id*. at pp. 2-3.)[2]  Defendant opposes.  (ECF No. 128 ("Opp.").)  The gravamen of Plaintiffs' class claims is that First American made misrepresentations in marketing home protection contracts, because First American routinely denies or delays legitimate claims made under the contracts.

After the filing of Plaintiffs' motion for class certification, Plaintiffs filed a motion for sanctions and the parties both filed *ex parte* motions for leave to file a notice of supplemental authority.

The Court finds these motions suitable for determination on the papers submitted and without oral argument.  *See* Civ. L.R. 7.1.  For the following reasons, Plaintiffs' motion for class certification (ECF No. 121) is **DENIED**, the *ex parte* motions regarding supplemental authority filed by the parties (ECF Nos. 139, 145, 146)[3] are **DENIED**, and Plaintiffs' motion for sanctions (ECF No. 132) is **DENIED**.

---

[1]      The breach of contract claim is being brought solely on behalf of Plaintiffs Carrera, Hershey, Morrison, and Diaz individually.  (ECF No. 115 at p. 49.)

[2]      Plaintiffs do not seek certification of their tortious breach of the implied covenant of good faith and fair dealing claim.

[3]      Having read and considered the moving papers, and good cause failing

# I.      FACTUAL BACKGROUND

First American is a nationwide provider of home warranty plans.  (Opp. at p. 8.)   The plans provide for the "repair or replacement" of covered systems and appliances that malfunction during the plan period due to "normal wear and tear," subject to certain exclusions. (*Id*.)  The plans expire after one year, but can be renewed for additional one year terms. (*Id*.)  During the class period, First American sold plans with a variety of configurations in more than 40 states.  (ECF No. 128-36 ("Hand Decl.") at ¶¶ 6-8.)   From March 2003 through April 2011, First American sold 3,220,026 home warranty plans.  (ECF No. 121-2 ("Bottini Decl.") at ¶ 26, Exh. 25.)

First American markets and advertises its plans through four channels: (1) real estate sales; (2) renewals; (3) starting in 2007, direct to consumer (via telephone and online); and (4) portfolio management (10 or more properties under contract).  (Opp. at p. 9; Hand Decl. at ¶ 5; ECF No. 128-35 ("Craney Decl.") at ¶ 4; ECF No. 128-16 ("Miles Decl.") at ¶ 3.)   The primary forms of marketing communication include "flyers, postcards, brochures, direct mail, email, social media, and websites."  (Hand Decl. at ¶ 9.)

First American home warranty plans can be obtained (1) in connection with the purchase of a residential property; (2) separately by ordering over the phone or through First American's website; or (3) by renewing a prior contract.  (Miles Decl. at ¶ 3.) For calendar years 2004 to 2013, inclusive, approximately 50% of First American's home warranty plans were sold in the real estate channel, 46% were sold in the renewal channel, 4% were sold in the direct-to-consumer channel, and less than 1% were sold in the portfolio management channel.  (Hand Decl. at ¶ 32.)

During the class period, from approximately March 2003 to June 2011, First American issued approximately 1,320 different versions of its contract.  (Miles Decl.

---

to appear, the Court **DENIES** the *ex parte* motions regarding supplemental authority. The Court will disregard any new argument contained in the motions.  To the extent the cases are relevant, the Court will locate them in its own research.

at ¶ 8.)   The contracts varied from state-to-state and year-to-year, and contained different types of coverage.  (*Id*. at Exhs. C, D.)

First American's records reflect that approximately 49% of plan holders never make a claim under their plan.  (*Id*. at ¶ 12.)   In addition, although imprecise, First American's records reflect that between March 6, 2003 and December 31, 2012, approximately 4.5% of all claims made were denied in full or in part.  (*Id*. at ¶ 11.)

### A.    Real Estate Sales Channel

In the real estate channel, First American employs approximately 100 "area managers" across the United States, who interact with local real estate agents.  (Hand Decl. at ¶ 10.)   The real estate agents, in turn, interact directly with home buyers and sellers, who then decide whether or not to purchase a home warranty plan with First American.  (*Id*. at ¶ 10.)   On occasion, home buyers and sellers use a real estate agent who does not interact with a First American area manager.  (*Id*. at ¶ 11.)   First American area managers are given discretion in determining how they want to market the plans.  (*Id*. at ¶¶ 12, 13.)   Marketing may include giving a live presentation at a real estate office or trade event, speaking or corresponding with a real estate agent, or distributing written marketing materials prepared by First American's sales and marketing department, which are available for the area manager to order.  (*Id*. at ¶ 12.)

Plaintiffs assert that First American's area managers are given standardized, written scripts.  (Bottini Decl. at Exhs. 1 and 2.)   As examples, Plaintiffs attach a First American Product and Services Home Warranty Training Presentation for real estate agents (*see id*.) and a Quick Reference Guide (*see id*. at Exh. 3) to their motion.  In the presentation, the agents are instructed to hand out and review First American's brochures.  (*Id*. at Exhs. 1 and 2.)   The guide contains a "suggested script" for buyers and sellers, which contains similar language to the brochures.  (*Id*. at Exh. 3.)

First American disputes the contention that it provides its area managers with a "script" to follow in selling its plans to buyers and sellers.  (Hand Decl. at ¶ 13.)   First American claims the "script" attached to Plaintiffs' motion is part of a PowerPoint

presentation approved by First American's sales and marketing department in 2010 for use by use by some area managers.  (*Id*. at ¶ 14.)  First American further claims this PowerPoint presentation was not used prior to 2010 and was never widely or uniformly disseminated to its network of area managers or available on First American's website.  (*Id*. at ¶¶ 14, 15.)

First American also contends that the Quick Reference Guide attached to Plaintiffs' motion (Bottini Decl. at Exh. 3), which was generated in 2012, was only in use in the 2012-2013 time frame, and was not widely used or disseminated during that time.  (Hand Decl. at ¶ 16.)  First American further asserts that the Quick Reference Guide was never available on First American's website.  (*Id*. at ¶ 16.)

First American admits that its sales and marketing department creates certain written materials, such as brochures and fliers, and sends those materials to many area managers to assist in the promotion of First American's home warranty plans or makes them available on First American's website.  (Hand Decl. at ¶ 17; Bottini Decl. at Exh. 28 ("Miles II Depo.") at 64:6-12; *see also* Bottini Decl. at Exhs. 42, 43, 46.)  However, First American contends they do not have a uniform practice of providing these materials and do not keep track of which specific materials the area managers opt to provide to the real estate agents.  (Hand Decl. at ¶¶ 19, 20.)  First American also does not monitor how each real estate agent uses the provided materials, if the agent uses them at all.  (*Id*. at ¶¶ 21, 24, 27.)

In the real estate channel, home warranty plans may be purchased by the: (1) real estate agent; (2) home seller; or (3) home buyer.  (Hand Decl. at ¶ 23; Craney Decl. at ¶ 5; Miles Decl. at ¶¶ 3, 4.)  Of the three options, the plans are more often purchased by the home seller or real estate agent.  (Hand Decl. at ¶ 25.)  The home buyer is rarely involved in the evaluation and selection of the plan, and may not receive a copy of the contract until after closing and taking possession of the home.  (*Id*. at ¶ 25.)  First American's marketing materials are aimed at both buyers and sellers.  (*See id*. at Exh. B.)

First American asserts that it has created a wide variety of marketing materials over the years, which have varied over time and from region to region. (*Id.* at 18, 28, 31, Exh. B.) Some of the materials are specifically created at the request of area managers to be tailored to a specific region. (*Id.* at ¶¶ 18, 28.) First American attaches to its Opposition a few examples of its advertising and marketing materials used in the real estate channel during the class period that do not reference Plaintiffs' alleged misrepresentations, and contain variations on the "cost comparison chart." (*Id.* at Exhs. A, B.) To their motion, Plaintiffs attach copies of eleven different brochures developed by First American containing the alleged misrepresentations. (Bottini Decl. at Exhibit 33.) First American contends that all of the brochures attached by Plaintiffs were intended for use exclusively in the real estate channel. (Hand Decl. at ¶ 29.)

Once escrow on a home purchase has closed, First American receives payment for the home warranty contract, typically a check drawn on the escrow account. (Miles Decl. at ¶ 4.) However, First American does not receive a copy of the underlying real estate purchase agreement, and has no way of knowing whether the buyer or seller agreed to pay for the premiums. (*Id.* at ¶ 4.) After First American receives an order and payment, First American mails a copy of the home warranty contract to the home buyer. (*Id.* at ¶ 4.)

### B.  Direct to Consumer Channel

First American created the direct-to-consumer channel in 2007. (*Id.* at ¶ 34.) The channel includes limited scale direct mailings, telephone calls from First American based on leads generated by third-party vendors, and plans purchased directly through First American's website. (*Id.* at ¶ 34; Bottini Decl. at Exhs. 44, 45.) First American contends that because of the cost effectiveness of delivering marketing materials, purchasers are more likely to see advertising in an electronic format – website or email – rather than in a print format. (Hand Decl. at ¶ 34; *see also* Bottini Decl. at Exhs. 10-14, 15 ("Craney Depo.") at 113:8-115:15.)

## C.   Portfolio Management Channel

First American created the portfolio management channel in February 2013. The channel is defined as purchasers buying 10 or more warranties for their properties, for any given year.  (Hand Decl. at ¶ 33.)

## D.   Renewals

When a home warranty plan is about to expire, First American mails various types of renewal correspondence to the holder of the plan.  (Craney Decl. at ¶ 5.)  The holder of the plan is not necessarily the person who purchased the plan.  (*Id*.) However, First American only mails renewal correspondence to the holder of the plan, regardless of who purchased the plan originally.  (*Id*.)  For a variety of reasons, approximately 7% to 10% of plan holders never receive any renewal correspondence from First American.  (*Id*. at ¶ 6.)

First American's renewal correspondence generally consists of a cover letter, plus one or more different marketing inserts called "buck slips."  (Craney Decl. at ¶ 7; Craney Depo. at 20:25-21:11; *see also* Bottini Decl. at Exh. 16.)  At various times during the class period, either three or four renewal letters were sent, at various intervals, prior to expiration of a plan.  (Craney Depo. at 74:8-24, 75:9-76:3, 84:1-9, 88:4-89:14; Miles II Depo. at 26:4-24, 27:5-10, 229:3-12.)  Each letter had several versions.  (Craney Depo. at 75:19-76:3, 88:4-10; Miles II Depo. at 26:4-24, 27:5-10.)

The renewal correspondence varied in content throughout the class period. (Craney Decl. at ¶¶ 8, 13-20; Craney Depo. at 84:1-9.)  Some of the cover letters and buck slips contained the allegedly false representations, while others did not.  (Craney Decl. at ¶¶ 8, 9, 14-15, 17-18, 20, Exhs. A- G; *see also* Bottini Decl. at Exh. 9.)  The renewal correspondence varied depending on the plan holder's payment method. (Craney Decl. at ¶¶ 9, 11-14.)   During the class period, First American used approximately 106 different buck slips, with each correspondence containing anywhere from one to three of these buck slips.  (*Id*. at ¶ 16.)  With limited exceptions, First American no longer has records of which plan holders received which buck slips

1   as part of their renewal correspondence during the class period.  (*Id.* at ¶ 16.)

2      In addition to renewal correspondence, First American also utilizes "inside

3   sales" staff to call customers whose plans are about to expire.  (*Id.* at ¶ 22; Craney

4   Depo. at 74:5-16.)  The sales staff is not provided with any uniform written script or

5   guidelines, but instead is given discretion and rely on its judgment in attempting to

6   convince the plan holder to renew.  (Craney Decl. at ¶ 22.)  On April 12, 2013, the

7   average renewal premium for First American nationwide was $580.  (Craney Depo.

8   at 67:13-22.)

9     **E.**    **Location**

10      If plan holders choose to renew, they can renew by telephone, through First

11   American's website, or by mail.  (Craney Depo. at 63:21-25.)  If plan holders renew

12   by mail, the renewals are sent to Van Nuys, California, regardless of where the plan

13   holder is located in the United States.  (*Id.* 63:2-14.)  First American does not maintain

14   records on the method plan holders use to renew.  (*Id.* at 64:1-9, 66:1-11.)

15      First American maintains call centers in Santa Rosa, California and Phoenix,

16   Arizona.  (Craney Depo. at 70:6-18; Miles Depo. at 27:17-24.)  The sales people who

17   work in the renewals and direct-to-consumer departments are in one of those two

18   locations.   (Craney Depo. at 70:6-22; Miles II Depo. at 20:14-21:8.)   The First

19   American marketing and sales personnel who assist in creating the renewal letters are

20   located in Santa Rosa, California. (Craney Depo. at 81:15-25; Miles II Depo. at 29:12-

21   30:18.)  Barry Miles, previously the Director of Call Center Operations and Senior

22   Director of Service Operations and now the Vice-President of Operations, is located

23   in Phoenix, Arizona.  (Miles Decl. at ¶ 2; Miles Depo. at 8:22-23; Miles II Depo. at

24   9:18-19.)  He previously supervised personnel in the offices in Van Nuys and Phoenix,

25   as well as a "near shore operation" in the Dominican Republic that is a third-party

26   service provider.  (Miles Depo. at 27:17-24, 29:12-16.)

27      The headquarters of First American is in California.  (Miles II Depo. at 8:3-11.)

28   Executives are located in Santa Rosa, Van Nuys, and Irvine, California, as well as

Phoenix, Arizona and Texas.  (*Id.* at 9:6-12, 10:14-17.)

### F.    Contractors

Before entering the "First American network," independent contractors are required to sign a "Service Agreement" with First American.  (Miles Decl. at ¶ 22; *see also* Bottini Decl. at Exhs. 6, 7, & 29 ("Horne Depo.") at 30:2-16.)  The Service Agreement requires contractors to, among other things: (1) "agree[] to contact homeowner within three hours of being contacted by First American;" (2) "agree[] to initiate service under normal circumstances within 48 hours of receipt of work order from First American;" (3) provide evidence of liability and worker's compensation insurance; and (4) "guarantee[] work performed for a period of thirty days and all parts replaced for a period of ninety days from completion of assignment."  (Miles Decl. at ¶ 22; *see also* Bottini Decl. at Exh. 7; Gosselin Depo. at 117:16-118:5.)  First American also requires that each of its contractors be licensed in the appropriate trade, which First American confirms with the relevant regulatory agency.  (Miles Decl. at ¶¶ 23, 24; Gosselin Depo. at 117:16-118:5.)  First American also tracks the expiration date of its contractors' licenses to ensure they are current.  (Miles Decl. at ¶ 24.)

First American utilizes various pricing structures for its contractors, including "uni-price," "flat rate," "default," "all-inclusive," "bid," and "value" payment methods.  (Miles Decl. at ¶ 25; *see also* Bottini Decl. at Exh. 8; Bottini Decl. at Exhs. 25 ("Kaszynski Depo.") at 147:11-148:1, 39.)  The pricing structures vary by what the contractor is obligated to pay and First American is obligated to pay for each job.  (Miles Decl. at ¶ 25.)  The percentage of contractors on any given pricing structure has varied considerably since 2003.  (Miles Decl. at ¶ 26; *see also* Kaszynski Depo. at 156:10-21.)

First American sends "Welcome Aboard" packages to all contractors.  (Horne Depo. at 30:2-32:7.)  Each contractor receives the same package, although the package has changed over the years.  (*Id.* at 30:2-32:7.)  Packages are sent out via e-mail, fax, or mail.  (*Id.* at 32:16-20.)

In allocating work to a contractor, First American claims "[e]ach contractor's circumstances are unique and are considered on a case-by-case basis," without one factor being determinative.  (Miles Decl. at ¶ 28; Kaszynski Depo. at 144:8-18.)  In allocating a percentage of work to a contractor, First American asserts that it takes into consideration the following factors: (1) volume of work a contractor is capable of handling; (2) the number of other contractors that work in the same trade for the same geographic area; and (3) "various cost and performance-related criteria."  (Miles Decl. at ¶¶ 28, 29; *see also* Bottini Decl. Exhs. 36-38.)

Evaluating contractor performance includes analyzing a number of reports, including homeowner complaint ("partner violation") reports, re-dispatch reports, continuation reports, recall (or call-back) percentage reports, cash out reports, repair versus replace reports, and reimbursement reports.  (Miles Decl. at ¶¶ 30, 33; *see also* Bottini Decl. at Exhs. 5, 53, 63; Kaszynski Depo. at 158:3-14; Horne Depo. at 215:19-217:20.)  First American claims it does not impose any hard or fixed numerical standard that its contractors must satisfy, but it will follow up if one of the performance reports is unusually high.  (Miles Decl. at ¶¶ 31, 39; Bottini Decl. at Exhs. 5, 19, 21, 23, 36-38, 54; Kaszynski Depo. at 144:8-18.)  If First American is not satisfied with the contractor's response to the follow up, it may either reduce or eliminate the work it allocates to that contractor.  (Miles Decl. at ¶ 31; Bottini Decl. at Exhs. 20 ("Gosselin Depo.") at 102:20-24; 107:14-109:20 & 52.)  First American states that it routinely reduces or eliminates work allocations due to unsatisfactory performance reports, even where the contractor's average cost per invoice is no higher than other similarly situated contractors.  (Miles Decl. at ¶ 31.)  In allocating work to contractors, First American claims it does not consider the rate of denial of claims serviced by a contractor.  (*Id*. at ¶ 32.)

For each claim, First American expects its contractors to first assess whether it is both possible and appropriate, under the circumstances, to repair a broken system or appliance, rather than replacing the entire system or appliance outright.  (Miles

Decl. at ¶ 27; Kaszynski Depo. at 143:23-144:7.)  In one of its welcome packages to contractors, First American stated: "FA is looking for repair oriented contractors.  We would like for you to attempt repair before you recommend replacement."  (Bottini Decl. at Exh. 6; *see also* Bottini Decl. at Exhs. 54-56, 62, 66.)  First American claims it does not encourage its contractors to make "inappropriate repairs," *i.e.*, repair an item when replacement is warranted.  (Miles Decl. at ¶27.)  From approximately 2008 to 2011, based on historical data, First American established the goal of a 6% to 8% replacement rate for "HVAC," *i.e.*, heating, ventilation, and air conditioning, work. (Gosselin Depo. at 106:19-107:11; Bottini Decl. at Exh. 19.)

First American attempts to track repair/replacement percentages for a certain subset of contractors (uni-price, flat rate, or default pricing structure), although its definitions of "repair" and "replace" "are to a large degree arbitrary and are used for comparative purposes only."  (Miles Decl. at ¶¶ 33, 34.)  For example, replacing a *part* in an appliance may be considered a "repair" or a "replacement."  (*Id*. at ¶ 34.) In addition, First American's designation of certain claims as "repair" or "replace" depends on the contractor's price structure.  (*Id*. at ¶¶ 35-38.)  With respect to replacement items that First American covers, it maintains records of those purchases. (*Id*. at ¶ 36.)  For contractors that have all-inclusive pricing which covers the purchase of all parts, First American does not maintain information on those purchases.  (*Id*.)

First American does not keep track of how much its customers pay other than the service trade fee.  (Miles II Depo. at 77:8-10; Horne Depo. at 187:2-6.)  The service trade fee is listed in the plan holder's contract and generally varies by location.  (Miles II Depo. at 73:2-20.)  A contractor does not need to call First American if it covers anything not covered by the contract.  (*Id*. at 78:3-4.)  Non-covered charges may be reflected in the "Notes" section in Falcon, First American's software.  (Miles II Depo. at 94:5-95:12; Horne Depo. at 186:8-23, 213:4-20; Bottini Decl. at Exh. 50.)  First American surveys its customers every month, but does not proactively solicit information on fees paid for non-covered charges.  (Miles II Depo. at 106:10-11,

117:14-16.)

### G.   Mandatory Arbitration Agreements

First American began adding mandatory arbitration provisions to new home warranty plans used in the portfolio management channel in February 2013.  (Hand Decl. at ¶ 36.)  Between February 2013 and early 2014, First American began adding arbitration clauses to its contracts on a state-by-state and channel-by-channel basis. (*Id*.)  By early 2014, all new plans issued in all channels had mandatory arbitration clauses.  (*Id*.)

### H.   Plaintiffs' Class Claims

Plaintiffs seek to certify a class for intentional misrepresentation, negligent misrepresentation, fraud by concealment, promissory fraud, unfair, unlawful or fraudulent conduct in violation of the UCL, and false advertising.  (Mot at pp. 2-3.)

#### 1.   Intentional and Negligent Misrepresentation

Plaintiffs allege First American made several "uniform and identical written representations" to the named Plaintiffs and each member of the Class, which were contained in First American's standard home warranty contract and written advertisements.  (Consol. Compl. at ¶¶ 64, 99, 104.)  The representations include: (1) First American covers unknown defects; (2) First American provides coverage for systems and appliances which malfunction due to lack of maintenance, rust or corrosion, or chemical or sedimentary buildup; (3) repair/replacement costs range between $85 and $7,500; (4) the cost with a First American plan is just $55; (4) First American responded to nearly 900,000 service requests and saved homeowners over $121 million dollars in home repair costs in 2007; (5) First American is a subsidiary of First American Corporation; and (6) having a First American home warranty on a home will give it a competitive edge over other homes on the market.  (*Id*. at ¶ 64.)

Plaintiffs contend these representations are false because: (1) First American routinely denies claims with pre-existing conditions; (2) First American routinely denies claims for pre-textual reasons, including lack of maintenance, rust, and

corrosion, even if these things are not the cause of the malfunction; (3) First American trains its employees to deny legitimate warranty claims based on pre-textual reasons; (4) First American financially incentivizes its contractors to deny legitimate claims and/or perform substandard repairs; (5) First American creates economic incentives for contractors to shift the cost of repair or replacement onto the consumer; (6) First American routinely delays authorizing repairs or purchasing necessary equipment; (7) First American's customers routinely have to pay more than the service call fee because First American's contractors cause First American to deny, in whole or part, claims that should have been covered under the policy; (8) First American's contractors routinely gouge customers for the "non-covered" portions of warranty replacements and repairs; (9) First American's contractors routinely upsell customers for repairs and replacements that are not covered under the home warranty plan; (10) First American has no way of knowing how much its customers have to pay out of their pocket for repairs and replacements because it does not keep track of such costs; (11) First American paid out only $94.3 million in claims during 2007; (12) First American is a subsidiary of First American Title Insurance Company; and (13) there is no evidence a First American home warranty gives the seller a competitive edge on the market.  (*Id*. at ¶ 64.)

### 2.   Concealment

Plaintiffs allege that First American had a duty to disclose all material facts to its insureds pursuant to California Insurance Code section 332.  (*Id*. at ¶ 108.)  Given this duty, Plaintiffs allege that Defendant failed to disclose the following: (1) First American tells its contractors to repair rather than replace items, even where a replacement is necessary, and even under situations where repairing rather than replacing an item would pose a threat to the safety of First American's customer; (2) the consumer will pay significant sums out of pocket for the replacements First American does authorize, above and beyond what they have already paid for the premium and service call fees; (3) First American pays its contractors significantly

below retail rates; (4) First American allows its contractors to charge full retail rates to First American's customers and encourages its contractors to earn their money mostly from the customer; (5) First American does not police its contractors with respect to charges they impose on First American's customers above and beyond First American's coverage under the home warranty plans and intentionally does not keep track of these charges; and (6) First American encourages a "race to the bottom" with respect to its contractors, by rewarding those who keep their average cost per call at a minimum.  (*Id*. at ¶ 109.)

### 3.  Promissory Fraud

Plaintiffs allege that First American promises customers that it will repair or replace covered systems, and the insured will only pay the service call fee to have any covered system repaired or replaced.  (*Id*. at ¶¶ 116-119.)  Plaintiffs allege that First American never had any intention of complying with these promises.  (*Id*. at ¶¶ 120-121.)

### 4.  UCL and FAL

Plaintiffs allege First American violated the unfair, fraudulent, and unlawful prongs of the UCL.  (*Id*. at ¶ 134.)  Plaintiffs allege that First American violated the unlawful prong by: (1) engaging in the fraud outlined above; (2) violating the FAL; (3) breaching its contracts with Plaintiffs; (4) violating the implied covenant of good faith and fair dealing; (5) violating California Insurance Code section 332; and (6) violating California's Unfair Insurance Practices Act.  (*Id*. at ¶¶ 135-139.)  Plaintiffs also allege First American violated the UCL and FAL by making or causing to be made the untrue and misleading statements set forth above.  (*Id.* at ¶ 144.)

### I.  Named Plaintiffs

#### 1.  Nancy Carrera

Plaintiff Nancy Carrera ("Carrera") purchased a home in Virginia Beach, Virginia in or about February 2009.  (ECF No. 128-10 ("Shophet Decl.") at Exh. B at 19:11-14.)  Carrera's real estate agent, Jen Basnight, purchased a First American home

1   warranty plan for Carrera in connection with the home purchase.  (Shophet Decl. at

2   Exh. B at 119:18-121:23; Exhs. K, L; Consol. Compl. at Exh. A.)  Ms. Basnight

3   informed Carrera that she purchases plans as a courtesy for the people who use her

4   services.  (Shophet Decl. at Exh. B at 121:15-23.)  The money came from the seller's

5   funds.  (*Id*. at Exhs. K, L.)

6        Carrera recalls discussing over the phone with Ms. Basnight the types of

7   services and warranties offered by First American and 2-10 Home Buyers Warranty.

8   (Bottini Decl. II at Exh. 85 at 52:8-54:18.)  Carrera testified she picked a home

9   warranty company based in part on this conversation.  (*Id*. at 54:6-8.)  Prior to learning

10  that Ms. Basnight had purchased a First American home warranty plan for her, Carrera

11  does not recall seeing any advertising about a home warranty company.  (Shophet

12  Decl. at Exh. B at 120:11-24.)  After Ms. Basnight informed Carrera that she had

13  purchased a home warranty plan for her, Carrera went online and did some research

14  about First American.  (*Id*. at 120:6-10, 121:6-8.)  Carrera testified that she liked First

15  American's broad range of services and their low service fee.  (*Id*. at 121:6-8.)

16       Shortly after escrow closed on her home, in her closing packet, Carrera received

17  her First American contract along with several brochures for home warranty

18  companies.  (Bottini Decl. at Exh. 34 at 137:15-138:22; ECF No. 129-1 ("Bottini Decl.

19  II") at Exh. 85 at 40:8-14, 118:14-18, 134:16-21.)  Carrera reviewed the First

20  American brochure.  (Bottini Decl. at Exh. 34 at 137:15-138:22.)  The brochure and

21  attached "First American Home Warranty Sample Contract" contain several of the

22  alleged misrepresentations.  (*See id*. at Exh. 34 at Exh. 13.)

23       After reviewing the brochures, Carrera testified that she found "important"

24  "[t]he service charge being low of $100, that it covered a broad, broad variety of

25  appliances in [her] home, the customer service satisfaction[,] and . . . the quick

26  response."  (Bottini Decl. at Exh. 34 at 140:12-141:5; Bottini Decl. II at Exh. 85 at

27  116:14-117:19.)  Carrera also went on First American's website at the time she

28  received the brochures.  (Bottini Decl. at Exh. 34 at 141:6-11.)  Carrera reviewed this

information before the deadline to cancel her First American policy. (*Id*. at Exh. 34 at 139:4-140:5.)

Carrera's First American home warranty plan was effective from February 20, 2009 through February 19, 2010. (Miles Decl. at ¶ 14.) In June 2009, she made a claim with respect to her air conditioning unit. (*Id*. at Exh. E.) Carrera did not renew her plan upon expiration. (*Id*. at ¶ 14.)

### 2. Karene Jullien

Plaintiff Karene Jullien ("Jullien") purchased a home in Sherman Oaks, California in or about June 2010. (Shophet Decl. at Exhs. E ("Jullien Depo.") at 18:20 – 20:10; U, V.) The home purchase agreement executed by Jullien states that the seller of the property was responsible for paying the cost, not to exceed $350, of a one year home warranty plan to be determined by the buyer during the escrow period. (Shophet Decl. at Exh. U, ¶ 4(E)(5).) However, a later revised invoice indicates Jullien might have purchased the plan herself for $330. (*Id*. at ¶ 27, Exh. W.)

After reviewing the evidence submitted by all parties, it is unclear who purchased the initial plan. During Jullien's deposition, however, she testified that she did not choose First American, and there is no evidence that she read or relied on any representations from First American. Jullien's broker in connection with this purchase was Ronald Zate. (*Id*. at Exh. E at 20:12-20.) Jullien testified that prior to the close of escrow she did not discuss any specific home warranty company with Mr. Zate. (*Id*. at 51:9-16.) However, she informed Mary Stu Bryan, the individual responsible for obtaining her home warranty plan, that she wanted a plan that would specifically cover her AC. (Bottini Decl. II. At Exh. 87 at 39:17-41:15.) She informed Ms. Bryan: "It doesn't [which company] matter as long as it covers the AC." (*Id*. at 39:20-21.) Jullien later testified that she does not know who ultimately chose First American and did not do any research comparing different home warranty companies prior to close of escrow. (Shophet Decl. at Exh. E at 51:2-25.)

Jullien's initial First American Home Warranty Plan was effective from June

17, 2010 through June 16, 2011.  (Miles Decl. at ¶ 21.)  During her initial contract term, beginning in or around April 2011, Jullien made claims with respect to her air conditioning unit, in that it was not cooling properly and it was dripping.  (Shophet Decl. at Exh. E at 97:7-24; Miles Decl. at ¶ 20, Exh. I.)

In or around October 2011, Jullien renewed her contract with First American effective October 14, 2011.  (Miles Decl. at ¶ 21; *see also* Consol. Compl. (ECF No. 116) at Exh. D.)   Prior to this renewal, Jullien spoke with a First American representative over the phone.  (Bottini Decl. II at Exh. 87 at 138:23-139:18.)  She asked the technician to confirm whether or not her old air conditioning system would be covered, and he confirmed that it would be covered.  (*Id*. at 139:5-18.)  According to Jullien, the First American representative "said that he understood that the system was old, and they would take on the repair or replacement of the system if it failed again.  And he even said wouldn't that be sweet for less than $500 a month – a year." (*Id*. at 139:14-18.)

In August 2012, Jullien received a $1,640.88 cash settlement in lieu of the replacement of her hydronic air handler, which she accepted.  (Shophet Decl. at Exhs. Z, AA, BB.)  Jullien was ultimately satisfied with how First American resolved the claim she had made.  (*Id*. at Exh. E at 69:2-20.)

Jullien's plan expired on October 13, 2012.  (Craney Decl. at ¶ 10; Miles Decl. at ¶ 21.)  On or around August 6, 2012, Jullien was mailed an auto-renewal cover letter and notice.  (Craney Decl. at ¶ 10.)  She did not renew her second home warranty plan.  (Miles Decl. at ¶ 21.)

### 3.   Brent Morrison

Brent Morrison ("Morrison") purchased a home in Canyon Country, California in or around April 2012.  (Shophet Decl. at Exhs. C at 21:5-9, M, N; Bottini Decl. at Exh. 69, ¶ 2.)  The Purchase Agreement and Joint Escrow Instructions executed by Morrison states that the seller of the property was responsible for paying the cost, not to exceed $375, of a one year home warranty plan issued by First American.  (Shophet

1    Decl. at Exh. M, ¶ 4(D)(6).)   In April 2012, Morrison's real estate agent, Danny

2    Tresierras, ordered a First American home warranty plan.  (*Id*. at Exhs. C at 16:17-24,

3    Q, R.)  Mr. Tresierras informed Morrison he chose First American because a past

4    client of his said they do a good job.  (Shophet Decl. at Exh. C at 25:5-15; Bottini

5    Decl. at Exh. 70, ¶ 2.)   Mr. Tresierras and Morrison did not have any other

6    conversations about First American prior to Morrison signing the Purchase

7    Agreement, or any conversations about other home warranty companies.  (Shophet

8    Decl. at Exh. C at 25:16-25.)

9          After Mr. Tresierras ordered the plan, an invoice was sent to Mr. Tresierras and

10   the escrow company.  (Shophet Decl. at Exh. R.)  However, as reflected in subsequent

11   Sale Escrow Instructions (dated after the Purchase Agreement and Joint Escrow

12   Instructions) the sellers countered the plan out of the deal and did not provide a one-

13   year home warranty plan for the property in the transaction.  (Shophet Decl. at Exhs.

14   O, Q; Bottini Decl. at Exh. 69, ¶ 2.)

15         When Morrison signed the loan documents, he still understood that a home

16   warranty was included.  (Shophet Decl. at Exhs. Q, P.)  He subsequently made a claim

17   on the plan on May 8, 2012.  (*Id*. at Exh. P.)  Upon being informed that no plan had

18   been purchased, Morrison purchased a First American plan.  (*Id*. at Exhs. R, P.)  First

19   American backdated the plan to the date the first claim was made on the property.  (*Id*.

20   at Exh. P.)  Therefore, Morrison's First American home warranty plan was effective

21   from May 8, 2012 through May 7, 2013.  (Miles Decl. at ¶ 16; Shophet Decl. at Exh.

22   S.)  Morrison did not renew his plan upon expiration.  (Miles Decl. at ¶ 16.)

23         In a declaration filed in state court, Morrison states that he received several

24   different brochures from different home warranty companies which solicited him to

25   buy a home warranty contract after escrow closed on his house.  (Bottini Decl. at Exh.

26   69, ¶ 3.)  He claims he chose First American based on the "benefits and coverage

27   provided by First American . . . compared to the contracts offered by [other

28   companies], as well as the fact that [his] real estate agent had previously recommended

First American." (*Id.* at ¶ 4.)  It is unclear when Morrison read the brochure, as he does not reference his initial claim and confusion, and which representations in the brochure he relied on.

Morrison did not retain the brochure he read and relied on, but attaches one that is "substantially similar" to the one he received.  (Bottini Decl. at Exh. 69, ¶ 4, Exh. A.)  The brochure and attached "First American Home Warranty Sample Contract" contain several of the alleged misrepresentations.  (*Id.*)

### 4.  Anna Hershey

Anna Hershey ("Hershey") purchased a home on Cliffridge Avenue in La Jolla, California ("Cliffridge Property") in 1999.  (Shophet Decl. at ¶ 22, Exh. D at 12:6-8.) Prior to July 2011, Hershey rented this property to tenants.  (*Id.* at 13:3-12.)  After that date, Hershey personally lived on the property.  (*Id.* at 13:3-12.)

Hershey received a First American home warranty plan for the property as a gift in 1999.  (*Id.* at 19:10-17, 74:19-25; Bottini Decl. at Exh. 70 at ¶ 2.)  Hershey renewed the plan from time to time.  (Shophet Decl. at Exh. D at 20:10-22; Bottini Decl. at Exh. 70 at ¶ 2.)  As relevant to this case, Hershey purchased a plan for this property effective July 2, 2010 through July 1, 2011.  (Miles Decl. at ¶ 19; Bottini Decl. at Exh. 70 at ¶ 2.)  She renewed her plan upon expiration.  (Miles Decl. at ¶ 19; Bottini Decl. at Exh. 70 at ¶ 2.)  Her new plan was effective July 2, 2011 through July 1, 2012.  (Miles Decl. at ¶ 19.)  She initially renewed this plan after expiration in July 2012, but changed her mind and received a refund.  (*Id.* at Exh G at 558.)

Hershey also purchased a home on Westbourne Street in La Jolla, California ("Westbourne Property") in 1985.  (Shophet Decl. at ¶ 23, Exh. D at 28:5-7.)  Prior to moving into the Cliffridge Property in July 2011, she lived in the Westbourne Property.  (*Id.* at Exh. D at 22:13-25.)  Hershey did not purchase the First American home warranty plan for the Cliffridge Property contemporaneously with the property. (*Id.* at ¶ 23, Exh. D at 28:8-11.)  Hershey first purchased a home warranty plan with First American for the Westbourne Property in or around 2004.  (*Id.* at Exh. D at

28:12-21.)  She thereafter renewed the home warranty contract for this property.  (*Id*. at ¶ 23, Exh. D at 30:9-12.)

As relevant to this case, Hershey purchased a First American home warranty plan for the Westbourne Property effective May 16, 2011 through May 15, 2012. (Miles Decl. at ¶ 19.)  She renewed her plan upon expiration.  (*Id*. at ¶ 19.)  Her new plan was effective May 18, 2012 through May 17, 2013.  (*Id*. at ¶ 19.)  She did not renew the plan after expiration.  (*Id*. at ¶ 19.)

In 2009 and 2010, Hershey attended classes at Mesa College to obtain her real estate license.  (Shophet Decl. at Exh. D at 35:7-25.)  While she was at Mesa College, First American home warranty plans were pitched by Lisa Wood, an area representative, who handed out First American brochures. (*Id*. at 36:17-25; Miles Decl. at Exh. G, p. 513.)   Hershey also received First American brochures from Prudential, Grossmont College, and REBA, which is a La Jolla real estate association. (Shophet Decl. at Exh. D at 38:11-16, 40:2-17.)  Hershey stated in an April 2013 declaration that she saw and relied on "numerous advertisements from Defendant First American" at an unspecified time.  (Bottini Decl. at Exh. 70 at ¶ 3.)  Hershey further stated that the unspecified "statements and representations" in the brochures "were significant and substantial reasons that caused [her] to purchase the home warranty contracts from First American."  (*Id*.)  She attaches two brochures to her declaration. (*Id*. at ¶ 2, Exhs. B, C.)  The brochures and attached "First American Home Warranty Sample Contract" contain several of the alleged misrepresentations.  (*Id*. at ¶ 4, Exhs. B, C.)

Prior to the time she purchased or renewed her home warranty contracts, Hershey states that she received "numerous additional advertisements and brochures from First American," which she specifically recalls stated that: First American provided both repair and replacement coverage; she would only pay one small service fee for each covered claim; the home warranty contracts provided budget protection for costly breakdowns; and First American had a "large network of 'pre-screened,

1   certified service technicians.'"   (*Id*. at ¶ 4.)  Hershey states that these representations

2   were "significant and material representations," which influenced her decision to

3   purchase a First American home warranty contract instead of contracts offered by

4   numerous competitors.  (*Id*.)

5        Hershey also claims she received letters from First American urging her to

6   renew her contracts.  (*Id*. at ¶ 5.)  Hershey says she read and relied upon these letters

7   in renewing her coverage, in addition to the First American brochures and ads she had

8   previously seen.  (*Id*.)

9        In early 2011, Hershey maintained a "blog" on Zillow called "Anna Hershey's

10  Advice."  (Shophet Decl. at Exhs. D at 52:4-11; T.)  On the blog, she answered a

11  question about home warranty companies on January 5, 2011.  (*Id*. at Exh. T.)  In

12  response, she stated: "Hi. I am very happy with First American Home Buyers

13  Protection.  Also used them for a rental.  Available service is all spelld [sic] out in the

14  contract, they respond promptly.  Affiliated with Prudential."  (*Id*. at Exh. T.)  Hershey

15  did not Google First American, however, until after she had problems with them.  (*Id*.

16  at Exh. D at 74:9-18.)

17       Hershey had claims relating to an oven door denied on the Cliffridge Property

18  in or around November 2010 and May 2012 because the damage was determined not

19  to be due to normal wear and tear.  (Miles Decl. at Exh. G, pp. 529, 541-548, 553.)

20  She also had a claim relating to an oven door on the Westbourne Property denied in

21  June 2012 because the damage was determined not to be due to normal wear and tear.

22  (*Id*. at Exh. H, pp. 566-574.)

23            5.   Emily Diaz

24       In or around November 2007, Emily Diaz ("Diaz") purchased a residential

25  property with multiple units on Brighton Avenue in San Diego, California.  (Shophet

26  Decl. at ¶ 36, Exhs. FF, HH, & CC at 81:15-84:25.)  The Purchase Agreement for the

27  property represents that the seller will pay for a one-year home warranty plan issued

28  by CRES, not to exceed $750.  (*Id*.  at Exhs. FF at 268 & CC at 86:8-13.)  The counter-

offer states that the home warranty company will be the seller's choice. (*Id.* at Exh. FF at 266 & CC at 87:9-89:7.) Diaz was represented during the purchase by realtor Jimmy Loucks. (*Id.* at Exh. CC at 82:19-83:2.)

Diaz testified that she first became a contract holder with First American in December 2007 in connection with the Brighton Avenue property. (*Id.* at Exhs. CC at 14:23-15:3 & GG.) Prior to receiving her First American home warranty contract in the mail, she never spoke with anybody at First American, went online to research the company, or read about them in the paper. (*Id.* at Exh. CC at 208:11-209:11.)

During her contract with First American, Diaz submitted a claim for a shower drain that was not draining properly in March 2008, and a claim for a water heater in December 2008. (*Id.* at Exh. CC at 76:13-78:3, 186:14-20; Consol. Compl. at ¶ 53.) First American denied the claims. (Shophet Decl. at Exh. CC at 168:12-20.) Diaz ultimately hired and paid outside contractors to fix these issues. (*Id.* at Exh. CC at 76:13-78:3, 168:12-25.)

## II.   PROCEDURAL HISTORY[4]

### A.   Diaz Action

On March 6, 2009, Emily Diaz ("Diaz") commenced a class action against Defendant in San Diego Superior Court. (*Diaz v. First American Home Buyers Protection Corporation*, Case No. 09-cv-00775-BAS(JLB) ("Diaz Action"), ECF No. 1, Exh. A.) On April 15, 2009, Defendant removed the Diaz Action to federal court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332, 28 U.S.C. § 1441(a) and (b), and 28 U.S.C. § 1453. (*Id.*)

On June 22, 2009, the Court granted Defendant's motion to dismiss Diaz's third cause of action for violation of the Consumer Legal Remedies Act ("CLRA") without leave to amend and Diaz's fourth cause of action for violation of the UCL to the extent

---

[4]      The Court takes judicial notice of prior filings in the Diaz Action and the Carrera Action. (*See* ECF No. 128-1 at Exhs. A-P, U-W.) *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

it relies on a violation of California Insurance Code §§ 790 *et seq.* or the CLRA.  (Diaz Action, ECF No. 15.)  The Court also dismissed without prejudice Diaz's fifth and sixth causes of action for intentional misrepresentation and false promise.  (*Id.*)

On July 24, 2009, Diaz filed a First Amended Complaint.  (Diaz Action, ECF No. 16.)  On September 21, 2009, the Court dismissed Diaz's UCL claim to the extent it relies on the violations of section 300 *et seq.* of the California Insurance Code and section 7000 *et seq.* of the California Business and Professions Code.  (Diaz Action, ECF No. 24.)  The Court also dismissed Diaz's fourth and fifth causes of action to the extent they rely on fraudulent concealment.  (*Id.*)  Defendant filed an Answer to the First Amended Complaint on October 21, 2009.  (Diaz Action, ECF No. 25.)

With leave of Court, Diaz filed a Second Amended Complaint on May 17, 2010.  (Diaz Action, ECF No. 38.)  On July 23, 2010, the Court granted Defendant's motion to dismiss the UCL claim on the grounds the claim was based on alleged violations of the California Unfair Insurance Practices Act ("UIPA"), which provides no private right of action.  (Diaz Action, ECF No. 51 at p. 3.)  The Court also struck paragraphs 41(b)-(e) from the SAC.  (*Id.* at pp. 4-5.)  Defendant filed an Answer to the Second Amended Complaint on August 23, 2010.  (Diaz Action, ECF No. 54.)

On July 8, 2011, Diaz moved for class certification.  (Diaz Action, ECF No. 87.)  The proposed class consisted of:

> All persons and entities in the United States who, during the period from approximately March 6, 2003 through the present (the "Class Period"), purchased, and/or made a claim under, a home-warranty policy issued by Defendant First American Home Buyers Protection Corporation.  Excluded from the class are defendants and their parents, subsidiaries, affiliates, all governmental entities, and co-conspirators.

(*Id.* at p. 2.)   The proposed class was estimated to contain at least 1,339,900 individuals.  (*Id.*)  Diaz sought to certify two classes, a damages class under Federal Rule of Civil Procedure 23(b)(2), and a class seeking rescission and restitution damages under Rule 23(b)(3).  (*Id.*)  Diaz sought class certification of not only her breach of contract, breach of implied covenant of good faith and fair dealing,

1  intentional misrepresentation, negligent misrepresentation, and false promise claims,

2  but also for her dismissed UCL claim to preserve her rights.  (*Id*. at p. 16.)

3        On September 8, 2011, the Court denied Diaz's motion for class certification.

4  (Diaz Action, ECF No. 114.)  The Court denied certification of Diaz's claims under

5  Rule 23(b)(2) on the grounds they failed the superiority and predominance analysis.

6  (*Id*. at pp. 8-13.)  The Court further denied certification under Rule 23(b)(3) on the

7  grounds Diaz's allegations of future harm were "purely speculative" and Diaz did not

8  offer evidence to rebut Defendant's evidence that the independent contractors do not

9  deny claims and only deny approximately 4% of claims.  (*Id*. at p. 14.)  The Court did

10  not address Diaz's UCL claim.

11        Following the Court's denial of class certification, Defendant moved to dismiss

12  for lack of subject matter jurisdiction on October 31, 2011 on the grounds Diaz refused

13  to accept its Rule 68 Offer of Judgment for an amount greater than any amount she

14  could possibly recover at trial.  (Diaz Action, ECF No. 125.)  On November 29, 2011,

15  the Court granted the motion to dismiss.  (Diaz Action, ECF No. 129.)

16        On November 18, 2013, the Ninth Circuit held that "an unaccepted Rule 68

17  offer that would fully satisfy a plaintiff's claim is insufficient to render the claim

18  moot."  (Diaz Action, ECF No. 163 at 16.)  The Ninth Circuit also vacated the

19  dismissal of Diaz's concealment and UCL claims.  (*Id*.)  The Ninth Circuit held that

20  Diaz adequately alleged violations of the UCL "because her claims are premised on

21  fraud, breach of contract and breach of the implied covenant of good faith and fair

22  dealing, even if [Defendant's] alleged conduct also may have violated [UIPA]."  (*Id*

23  at 20.)

24        The remaining claims in the *Diaz* matter after appeal therefore included class

25  claims for (1) concealment and (2) violation of the UCL, and individual claims for (1)

26  breach of contract, (2) breach of the implied covenant of good faith and fair dealing,

27  (3) intentional misrepresentation, (4) negligent misrepresentation, and (5) false

28  promise.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    Carrera Action

On September 23, 2009, Carrera filed a class action complaint against Defendant in Los Angeles Superior Court ("Carrera Action").  (ECF No. 1 at Exh. A; Diaz Action, ECF No. 65-2.)  The complaint initially sought only injunctive and declaratory relief.  (ECF No. 1 at Exh. A.)  Defendant attempted to remove the Carrera Action to federal court three times.  (*Id*. at ¶¶ 7, 12; Diaz Action, ECF No. 170-1 at p. 2.)  Twice it was transferred from the Central District of California to the Southern District of California and remanded.  (ECF No. 1 at ¶¶ 7-16.)  After the second remand, on or about August 23, 2012, Carrera filed a Second Amended Complaint in Los Angeles Superior Court, adding plaintiffs Anna Hershey, Karene Jullien, and Brent Morrison.  (*Id*. at Exh. O.)

On September 6, 2013, following Defendant's third removal, the Court denied Plaintiffs' motion to remand.  (ECF No. 44.)  Following the Ninth Circuit's decision in the Diaz Action, Plaintiffs in the Carrera Action were granted leave to file a Third Amended Complaint, which they did on November 6, 2013.  (ECF Nos. 51, 52.)  On January 17, 2014, the Court denied Defendant's motion to dismiss the Third Amended Complaint.  (ECF No. 72.)

In the Third Amended Complaint, Plaintiffs alleged the following class claims: (1) tortious breach of the implied covenant of good faith and fair dealing; (2) violation of California Civil Code § 1710(3) (concealment); (3) violation of California Civil Code § 1710(4) (promissory fraud); (4) a violation of the UCL; (5) false advertising; and (6) declaratory relief; as well as individual claims for breach of contract on behalf of plaintiffs Carrera, Hershey, and Morrison.  (ECF No. 52.)

### C.    Intervention

On December 17, 2010, Ms. Carrera moved to intervene in the Diaz Action on the grounds her claims share common questions of law and fact.  (Diaz Action, ECF No. 62 at p. 2.)  Diaz did not oppose the intervention.  (Diaz Action, ECF No. 64.)  Defendant opposed the intervention on the grounds that it was untimely.  (Diaz Action,

ECF No. 65 at pp. 1-2.)  On January 12, 2011, the Court denied Ms. Carrera's motion to intervene on the grounds that it was "not timely at this late stage in the case."  (Diaz Action, ECF No. 69 at p. 4.)

### D.     Consolidation

On July 3, 2014, Diaz filed a motion to consolidate the Diaz Action and the Carrera Action.  (Diaz Action, ECF No. 170.)  Following a limited opposition by Defendant, the Court granted the motion, finding that consolidation for all purposes under Federal Rule of Civil Procedure 42(a)(2) was warranted.  (Diaz Action, ECF No. 180, at p. 8.)  The Court designated the Carrera Action to be the Lead Case under the caption *In re First American Home Buyers Protection Corporation Class Action Litigation*, Lead Case No. 13-cv-01585-BAS(JLB), and ordered the parties to file a consolidated complaint, which contained no new allegations or causes of action.  (*Id.* at pp. 9-10.)  Thereafter, Defendant was ordered to file an answer to the consolidated complaint which contained no new affirmative defenses or counterclaims.  (*Id.* at p. 10.)

On October 9, 2014, Plaintiffs filed a Consolidated Class Action Complaint against Defendant alleging: (1) tortious breach of the implied covenant of good faith and fair dealing; (2) violation of California Civil Code § 1710(1) (intentional misrepresentation); (3) violation of California Civil Code § 1710(2) (negligent misrepresentation); (4) violation of California Civil Code § 1710(3) (fraud by concealment); (5) violation of California Civil Code § 1710(4); (6) violation of California Business and Professions Code §§ 17200, *et seq.* (the "UCL"); (7) false advertising; (8) breach of contract;[5] and (9) declaratory relief.  (ECF Nos. 115, 116.)  On October 31, 2014, Defendant filed an answer to the Consolidated Class Action Complaint. (ECF No. 117.)

///

---

[5]     The breach of contract claim is being brought solely on behalf of Plaintiffs Carrera, Hershey, Morrison, and Diaz individually.  (ECF No. 115 at p. 49.)

## III.   LEGAL STANDARD

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).   "In order to justify a departure from that rule, 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'"  *Id.* (citing *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).  "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his [or her] compliance' with Rule 23."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Wal-Mart*, 131 S. Ct. at 2551-2552); *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

Rule 23 "does not set forth a mere pleading standard."  *Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2551.)  Rather, a party must satisfy "through evidentiary proof" all of the requirements of Rule 23(a), and at least one of the requirements of Rule 23(b).  *Id.*; *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, amended 273 F.3d 1266 (9th Cir. 2001).

Rule 23(a) outlines four requirements that must be satisfied for class certification: (1) the class must be so numerous that joinder of all members is impracticable; (2) questions of law or fact exist that are common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union*, 593 F.3d at 806 (citing Fed. R. Civ. P. 23(a)). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy.  *See, e.g., id.; Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.

1  1998).  A plaintiff must also establish at least one of the requirements outlined in Rule
2  23(b), including: (1) that there is a risk of substantial prejudice from separate actions;
3  (2) that declaratory or injunctive relief benefitting the class as a whole would be
4  appropriate; or (3) that common questions of law or fact predominate and the class
5  action is superior to other available methods of adjudication.  *Id.* at 806-07 (citing Fed.
6  R. Civ. P. 23(b)).  The requirement set forth in Rule 23(b)(3) is generally referred to
7  as "predominance."  *Id.* at 807.

8  In analyzing whether a plaintiff has met his or her burden to satisfy the Rule 23
9  requirements, it "may be necessary for the court to probe behind the pleadings."  *Wal-*
10  *Mart*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160
11  (1982)).  Class certification "is proper only if 'the trial court is satisfied, after a
12  rigorous analysis, that the prerequisites'" of Rule 23(a) and (b) have been satisfied.
13  *Id.* (quoting *Falcon*, 457 U.S. at 161); *see also Comcast Corp.*, 133 S. Ct. at 1432
14  (applying same analytical principles to Rule 23(a) and (b)); *Zinser*, 253 F.3d at 1186.
15  "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's
16  underlying claim.'"  *Comcast Corp.*, 133 S. Ct. at 1432 (quoting *Wal-Mart*, 131 S. Ct.
17  at 2551).  However, "Rule 23 grants courts no license to engage in free-ranging merits
18  inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
19  133 S. Ct. 1184, 1194-95 (2013).  Accordingly, any merits consideration must be
20  limited to those issues necessary to deciding class certification.  *See id.* at 1195
21  ("Merits questions may be considered to the extent—but only to the extent—that they
22  are relevant to determining whether the Rule 23 prerequisites for class certification
23  are satisfied.").

24  A district court is granted "broad discretion" to determine whether the Rule 23
25  requirements have been met.  *Zinser*, 253 F.3d at 1186; *see also Bateman v. Am.*
26  *Multi–Cinema, Inc.,* 623 F.3d 708, 712 (9th Cir. 2010); *In re Mego Fin. Corp. Sec.*
27  *Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) ("The district court's decision certifying the
28  class is subject to a very limited review and will be reversed only upon a strong

showing that the district court's decision was a clear abuse of discretion.") (internal quotations omitted).

## IV.  DISCUSSION

Plaintiffs propose the following class definition:

All persons who purchased or were listed as the named insured on a home protection contract issued by Defendant First American Home Buyers Protection Corporation from March 6, 2003 to the present (the "Class").[6]

(Mot. at p. 2.)  Plaintiffs primarily seek certification under Rule 23(b)(3) for monetary relief, including damages.  (Mot. at p. 16, n. 8.)  However, because they also seek a class-wide injunction to end Defendant's alleged unlawful practices, they contend Rule 23(b)(2) certification is also appropriate.  (*Id.*)

Plaintiffs seek certification of the class for the following claims: (1) intentional misrepresentation; (2) negligent misrepresentation; (3) fraud by concealment; (4) promissory fraud; (5) UCL violation; and (6) false advertising.  (*Id.* at pp. 2-3.) Defendant opposes on the grounds: (1) Plaintiffs' claims are atypical; (2) individual issues of law and fact predominate; and (3) the proposed class is not ascertainable. (Opp. at pp. 19-40.)

For the reasons set forth below, the Court finds Plaintiffs have failed to meet the predominance and superiority requirements of Rule 23(b)(3), and failed to establish that a class action is appropriate under Rule 23(b)(2).  Because Plaintiffs fail to meet the requirements of Rule 23(b), the Court finds it unnecessary to address the requirements of Rule 23(a).

### A.  Predominance

Rule 23(b)(3) requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual

---

[6]     Plaintiffs seek to certify a nationwide class.  However, if the Court finds application of California law to a nationwide class to be inappropriate, Plaintiffs seek to certify a California class.  (Mot. at p. 2, n. 2.)

members."  Fed. R. Civ. P. 23(b)(3).  "The predominance inquiry focuses on 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Hanlon*, 150 F.3d at 1022).  As the Ninth Circuit has stated:

> Rule 23(b)(3)'s predominance and superiority requirements were added to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  Accordingly, a central concern of the Rule 23(b)(3) predominance test is whether adjudication of common issues will help achieve judicial economy.

*Id.* at 944 (internal quotation marks and citations omitted).

"When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022 (citation omitted).  In contrast, when "claims require a fact-intensive, individual analysis," then class certification will "burden the court" and be inappropriate.  *Vinole*, 571 F.3d at 947; *see also Zinser*, 253 F.3d at 1189 ("[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate[.]") (citation omitted).  Though there is substantial overlap between Rule 23(a)(2)'s commonality and Rule 23(b)(3)'s predominance tests, the latter is a "far more demanding" standard.  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).  To determine whether questions of law or fact common to the class predominate, the court must analyze each claim separately.  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184 (2011)).

///

1    1.   Nationwide Class

2    The Court first examines whether common issues of law predominate as

3 Plaintiffs are attempting to apply California law to a nationwide class.  It is well-

4 established that where, as here, a federal court sits in diversity jurisdiction, the court

5 "must look to the forum state's choice of law rules to determine the controlling

6 substantive law." *Mazza*, 666 F.3d at 589 (quoting *Zinser*, 253 F.3d at 1187); *see also*

7 *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 545, n. 1 (C.D. Cal. 2012).

8    "Under California's choice of law rules, the class action proponent bears the

9 initial burden to show that California has 'significant contact or significant

10 aggregation of contacts' to the claims of each class member." *Id.* (quoting *Wash. Mut.*

11 *Bank v. Super. Ct.*, 24 Cal. 4th 906, 921 (2001)); *see also Bruno v. Quten Research*

12 *Inst., LLC*, 280 F.R.D. 524, 538-39 (C.D. Cal. 2011) (stating this requirement ensures

13 that the certification of a nationwide class under the laws of a single state comports

14 with due process).  "Once the class action proponent makes this showing, the burden

15 shifts to the other side to demonstrate 'that foreign law, rather than California law,

16 should apply to class claims.'" *Id.* at 590 (quoting *Wash. Mut. Bank*, 24 Cal. 4th at

17 921).  "California law may only be used on a classwide basis if 'the interests of other

18 states are not found to outweigh California's interest in having its law applied.'" *Id.*

19 (quoting *Wash. Mut. Bank*, 24 Cal. 4th at 921)).

20    To determine whether the interests of other states outweigh California's

21 interest, the court looks to a three-step governmental interest test:

22    First, the court determines whether the relevant law of each of
23    the potentially affected jurisdictions with regard to the particular
      issue in question is the same or different.

24    Second, if there is a difference, the court examines each
25    jurisdiction's interest in the application of its own law under the
26    circumstances of the particular case to determine whether a true
      conflict exists.

27    Third, if the court finds that there is a true conflict, it carefully
28    evaluates and compares the nature and strength of the interest of
      each jurisdiction in the application of its own law to determine

– 31 –

> which state's interest would be more impaired if its policy were
> subordinated to the policy of the other state, and then ultimately
> applies the law of the state whose interest would be more
> impaired if its law were not applied.

*Id.* (quoting *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81-82 (2010)).

The Court finds, and Defendant does not dispute, that Plaintiffs meet their initial burden of showing that California has a constitutionally sufficient aggregation of contacts to the claims of each putative class member because First American's headquarters are in California, it maintains at least one of its call centers in California, its sales and marketing personnel who assist in creating the renewal letters are located in California, the renewal letters are sent to California, approximately a third of its premiums were written in California at times during the class period, and several of its executives are located in California. *See Mazza*, 666 F.3d at 590. Because Plaintiffs meet their burden, Defendant must demonstrate that foreign law, rather than California law, should apply to class claims. *See id.*

Defendant submits a chart showing the material differences between California's consumer protection statutes and the consumer protection statutes of the other forty-nine states. (*See* Shophet Decl. at ¶ 44, Exh. NN.) In this case, during the class period, First American sold plans with a variety of configurations in more than 40 states. (*See* Hand Decl. at ¶ 7.) Under a conflict of laws analysis, "[a] problem only arises if differences in state law are material, that is, if they make a difference in this litigation." *Mazza*, 666 F.3d at 590 (citing *Wash. Mut. Bank*, 24 Cal. 4th at 919). In *Mazza*, the Ninth Circuit examined the consumer protection statutes of 44 states and concluded that the apparent differences between the states' consumer protection statutes were "not trivial or wholly immaterial differences." *Id.* at 591 (citing differences in scienter requirements between Colorado, New Jersey, and Pennsylvania; and reliance requirements between Florida, New Jersey and New York). These same differences are material in this case.

///

13cv1585

In examining the interests of foreign jurisdictions, the Ninth Circuit has concluded that each state has an interest in (1) "balancing the range of products and prices offered to consumers with the legal protections afforded to them;" and (2) "'being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future.'" *Id.* at 592-93 (quoting *McCann*, 48 Cal. 4th at 97-98).

Lastly, in analyzing which state's interest is most impaired, the Ninth Circuit held that it is determinative where the "last event necessary to make the actor liable occurred." *See id.* at 593-94. In a fraud case, "the place of the wrong was the state where the misrepresentations were communicated to the plaintiffs, not the state where the intention to misrepresent was formed or where the misrepresented acts took place." *Id.* (citing *Zinn v. Ex-Cell-O Corp.*, 148 Cal. App. 2d 56, 80, n. 6 (1957)).

In *Mazza*, the plaintiffs brought a class action alleging that Honda misrepresented and concealed material information in connection with the marketing and sale of certain Acura vehicles, alleging violations of the UCL, FAL, Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et. seq.*, and unjust enrichment. *Id.* at 587. Plaintiffs sought to certify a nationwide class of consumers who were exposed to the misrepresentations through television commercials, brochures, in-store kiosks, and the car's owner's manual. *Id.* at 586-87. In determining the "place of the wrong," the Ninth Circuit found that "the last events necessary for liability as to the foreign class members – communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles – took place in the various states, not in California." *Id.* at 594. Accordingly, the Court held that each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place. *Id.*

Here, with respect to every real estate purchase, which account for approximately 50% of the transactions, the Court finds the "place of the wrong" was

the state of purchase.  For renewals, which account for approximately 46% of the transactions, although the advertising was created in California, and one of the call centers was located in California, the misrepresentations were communicated to the putative class members in their respective home states, and therefore those jurisdictions have a stronger interest in the application of their laws.  Accordingly, the Court finds that each class member's UCL and FAL claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place, and certification of these claims on a nationwide basis should be denied.[7]

Plaintiffs request that the Court certify a California class, in the alternative, if the Court elects not to certify a nationwide class.  (ECF No. 129 ("Reply") at p. 24.) The Ninth Circuit did not foreclose that possibility in *Mazza*.  *See Mazza*, 666 F.3d at 594.  However, for the reasons set forth below, the Court does not find it appropriate to grant that request.  The Court now turns to the elements of each claim and examines whether common questions predominate.

### 2.   Fraud Claims

The elements of fraud under California law are: (1) a misrepresentation, which includes a false representation, concealment, or nondisclosure; (2) knowledge of its falsity; (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage.  *See Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996); *Agosta v. Astor*, 120 Cal. App. 4th 596, 603 (2004); *Cadlo v. Owens–Ill., Inc*., 125 Cal. App. 4th 513, 519 (2004).   The elements comprising a cause of action for negligent misrepresentation are the same, except there is no requirement of intent to induce reliance.  *See Cadlo*, 125 Cal. App. 4th at 519.

To establish fraud through nondisclosure or concealment of facts, a plaintiff similarly must prove: (1) the defendant concealed or suppressed a material fact; (2)

---

[7]   Although Defendant argues a nationwide class is inappropriate with respect to all of its claims, it has failed to meet its burden with respect to its remaining claims.

the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage. *See Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 162 Cal. App. 4th 858, 868 (2008); *see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012); *OCM Principal Opportunities Fund v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 845 (2007). A legal duty to disclose facts arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact. *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267-68 (C.D. Cal. 2007) (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997)).

As relevant here, California Insurance Code section 332 imposes a duty to disclose. *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490 (2003). California law also recognizes an insurer's "special relationship" with an insured, under which an insurer has the duty reasonably to inform an insured of her rights under an insurance policy. *See Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142, 1149-51 (2001); *Davis v. Blue Cross of N. Cal.*, 25 Cal. 3d 418, 426-27 (1979).[8]

"'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." *Lazar*, 12 Cal. 4th at 638; *see also Agosta*, 120 Cal. App. 4th at 603. "[I]ntent not to perform cannot be proved simply by showing a

---

[8]   *See* Diaz Action, at ECF No. 163 (Ninth Circuit Opinion) at 18.

subsequent failure to perform." *UMG Recordings, Inc. v. Global Eagle Entm't, Inc.*, --- F. Supp. 3d ----, 2015 WL 4606077, at *10 (C.D. Cal. June 22, 2015). "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Lazar*, 12 Cal. 4th at 638.

"Actual reliance occurs when the defendant's misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the transaction." *Cadlo*, 125 Cal. App. 4th at 519. In order to prove reliance on an omission, "[o]ne need only prove that, had the omitted information been disclosed one would have been aware of it and behaved differently." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993).

Defendant argues individual issues of law and fact will predominate as to Plaintiffs' fraud claims because no inference of reliance arises as to the entire class, and Plaintiffs have failed to provide a viable damages model. (Opp. at pp. 39, n. 33, 40.) To demonstrate that the element of reliance is a common question that can be resolved for all members of the Class in a single adjudication, Plaintiffs rely on the following statement of the law set forth in *Vasquez v. Super. Ct.*, 4 Cal. 3d 800 (1971):

> The rule in this state and elsewhere is that it is not necessary to show reliance upon false representations by direct evidence. The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement . . . than his direct testimony to the same effect. . . . [I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class. Defendants may, of course, introduce evidence in rebuttal.

*Id*. at 814 (internal quotations omitted); *accord Occidental Land, Inc. v. Super. Ct. of Orange Cnty.*, 18 Cal. 3d 355, 363 (1976). The Supreme Court of California clarified this statement in *Mirkin*, stating that "[w]hat we did hold [in *Vasquez* and *Occidental*] was that, *when the same material misrepresentations have actually been*

1    *communicated to each member of a class*, an inference of reliance arises as to the

2    entire class." *Mirkin*, 5 Cal. 4th at 1095 (emphasis in original).  Therefore, "absent

3    evidence of uniform material misrepresentations having been actually made to class

4    members," an inference of reliance does not arise.  *See Knapp v. AT&T Wireless*

5    *Servs., Inc.*, 195 Cal. App. 4th 932, 946 (2011) (quoting *Kaldenbach v. Mut. of Omaha*

6    *Life Ins. Co.*, 178 Cal. App. 4th 830, 851 (2009)).

7         Here, there is no evidence of common representations or omissions having been

8    made to putative class members.  Plaintiffs and Defendant agree that First American

9    markets and advertises its plans through three primary channels: (1) real estate sales;

10   (2) renewals; and (3) starting in 2007, direct to consumer (via telephone and online).

11   (Mot. at pp. 3-7; Opp. at p. 9; Hand Decl. at ¶ 5; Craney Decl. at ¶ 4; Miles Decl. at ¶

12   3.)   The primary forms of marketing communication include "flyers, postcards,

13   brochures, direct mail, email, social media, and websites."  (Hand Decl. at ¶ 9.)  The

14   parties further agree that First American home warranty plans can be obtained (1) in

15   connection with the purchase of a residential property; (2) separately by ordering over

16   the phone or through First American's website; or (3) by renewing a prior contract.

17   (Mot. at pp. 3-7; Miles Decl. at ¶ 3.)

18        In the real estate channel, Plaintiffs argue First American provides free, written

19   marketing materials to real estate agents, which are standardized and approved for

20   "company-wide distribution" in all states.  (Mot. at pp. 3-4.)  Plaintiffs further contend

21   First American uses a standardized, written script to train real estate agents on how to

22   sell its home warranty plans, which includes an instruction to hand out a written

23   brochure which is "almost identical" for all states and a sample home warranty

24   contract.  (*Id*. at pp. 4-5.)  Plaintiffs assert these brochures and contracts contain the

25   alleged misrepresentations.  (*Id*. at at p. 5.)  In the direct to consumer channel,

26   Plaintiffs argue First American makes its misrepresentations both through its website,

27   "which contains standardized written representations concerning the benefits and

28   attributes of its home warranty plans," and various print and media advertisements.

(*Id.* at pp. 5-6.)  Lastly, in the renewal channel, Plaintiffs argue First American sends several "standard form renewal letters" to its customers which contain the alleged false and misleading representations.  (*Id.* at p. 6.)  Based on this evidence, Plaintiffs argue First American engaged in a "uniform advertising campaign" to sell its plans.  (*Id.* at p. 7.)  For the reasons discussed below, the Court disagrees.

In the real estate channel, which accounts for approximately 50% of First American home warranty plans sold between 2004 and 2013, First American employs approximately 100 area managers who interact with local real estate agents.  (Hand Decl. at ¶¶ 10, 32.)  The real estate agents, in turn, interact directly with home buyers and sellers; although a buyer or seller does not necessarily use a real estate agent who interacted with an area manager.  (*Id.* at ¶¶ 10, 11.)  Contrary to Plaintiffs' contention, Defendant represents that First American area managers are given discretion in determining how they want to market the plans, which may include giving a live presentation at a real estate office or trade event, speaking or corresponding with a real estate agent, or distributing written marketing materials prepared by First American's sales and marketing department, which are available for the area manager to order.  (*Id.* at ¶¶ 12, 13.)  Although First American has at various times promoted a script to area managers, which includes the suggestion to hand out its brochures and samples contracts,[9] First American maintains that its area managers are given complete discretion and it does not impose any requirements or monitor how area managers choose to advertise.  (*Id.* at ¶¶ 19-21, 24, 27.)  Moreover, the area managers may be another step removed from the ultimate purchaser of the plan – the buyer or seller of the home.  Determining what representations were made between the area managers and the real estate agents, and also between the real estate agents and the

---

[9]     During the class period, from approximately March 2003 to June 2011, First American issued approximately 1,320 different versions of its contract, which varied from state-to-state and year-to-year, and contained different types of coverage.  (Miles Decl. at ¶ 8, Exhs. C, D.)

purchasers will therefore require a highly individualized inquiry.

In the renewal channel, which accounts for 46% of First American home warranty plans sold between 2004 and 2013, the renewal correspondence varied depending on the plan holder's payment method, and varied in content throughout the class period.  (Craney Decl. at ¶¶ 8, 9, 11-20; Craney Depo. at 84:1-9.)  Some of the cover letters and buck slips contained the allegedly false or misleading representations, while others did not.  (Craney Decl. at ¶¶ 8, 9, 14-15, 17-18, 20, Exhs. A- G; *see also* Bottini Decl. at Exh. 9.)  During the class period, First American used approximately 106 different inserts, with each correspondence containing anywhere from one to three of these inserts.  (Craney Decl. at ¶ 16.)  For a variety of reasons, approximately 7% to 10% of plan holders never receive any renewal correspondence from First American.  (*Id.* at ¶ 6.)

In addition to renewal correspondence, First American also utilizes a "inside sales" staff to call customers whose plans are about to expire.  (Craney Decl. at ¶ 22; Craney Depo. at 74:5-16.)  The sales staff is not provided with any uniform written script or guidelines, but instead are given discretion and rely on their judgment in attempting to convince the plan holder to renew.  (Craney Decl. at ¶ 22.)   Therefore, determining what representations each putative class member received or were exposed to prior to renewal, if anything, and what conversations were had between sales agents and customers will require a highly individualized inquiry.

Lastly, in the direct to consumer channel, which accounts for only 4% of First American home warranty plans sold between 2004 and 2013, putative class members received limited scale direct mailings, telephone calls from First American based on leads generated by third-party vendors, and plans purchased directly through First American's website.  (Hand Decl. at ¶¶ 32, 34; Bottini Decl. at Exhs. 44, 45.)  Again, determining which representations each putative class member received or were exposed to, if anything, will require a highly individualized inquiry.

In light of the foregoing, the Court finds Plaintiffs have failed to demonstrate

through evidentiary proof that the same material representations or omissions were made to each putative class member. There are significant individual issues as to whether the putative class members were even exposed to, much less relied on, the alleged misrepresentations. Accordingly, an inference of reliance does not arise as to all class members and cannot be resolved on a class-wide basis. *See Kaldenbach*, 178 Cal. App. 4th at 851; *Knapp*, 195 Cal. App. 4th at 946.

Although Plaintiffs' experiences are not determinative, it is instructive that among Plaintiffs, all of them initially obtained a First American home warranty plan in connection with the purchase of a home, and most, if not all, of the plaintiffs utilized real estate agents. Prior to purchasing and/or receiving a First American plan, not all of the plaintiffs were exposed to *any* representations about First American, much less the alleged misrepresentations. The other plaintiffs received different representations from their respective real estate agents about First American's home warranty plans. Not all of these representations included the alleged misrepresentations. Two of the five Plaintiffs renewed their plans, and each testified they relied on different representations from different sources. Again, not all of these representations included the alleged misrepresentations. Accordingly, the Court finds Plaintiffs have failed to establish predominance with respect to Plaintiffs' fraud claims.

In addition, "actual reliance, or causation, is inferred from the misrepresentation of a *material* fact." *Chapman v. Skype, Inc.*, 220 Cal. App. 4th 217, 229 (2013) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009)) (emphasis added); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011), abrogated on other grounds by *Comcast Corp.*, 133 S. Ct. 1426 (2013). "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009).

Here, the proposed Class contains three categories of individuals: (1) sellers; (2) real estate agents; and (3) buyers/owners. Plaintiffs have not demonstrated it can

1   establish materiality on a class-wide basis as to these three categories of individuals.

2   Based on the evidence submitted by Plaintiffs, certain real estate agents purchased the

3   home warranty plans as "gifts" for their clients, and others picked First American

4   because prior clients had a good experience with them.   Plaintiffs submitted no

5   evidence with respect to sellers, but it is implausible that buyers and sellers would

6   necessarily attach the same importance to alleged misrepresentations in First

7   American's advertising.[10]   Plaintiffs argue that materiality can be demonstrated on a

8   class-wide basis without distinguishing between the disparate categories of

9   individuals in their proposed Class, who are not similarly situated.   In the class

10   context, "[i]f the misrepresentation or omission is not material as to all class members,

11   the issue of reliance 'would vary from consumer to consumer' and the class should

12   not be certified."  *Stearns*, 655 F.3d at 1022-23 (citing *In re Vioxx Class Cases*, 180

13   Cal. App. 4th 116 (2010)).   For this reason as well, the Court finds Plaintiffs have

14   failed to establish predominance with respect to the fraud causes of action.

15              3.     UCL & FAL  (Proposed California Class)

16        The UCL prohibits, and provides civil remedies for, unfair competition, which

17   it defines as "any unlawful, unfair or fraudulent business act or practice and unfair,

18   deceptive, untrue or misleading advertising."  *Kwikset Corp.*, 51 Cal. 4th 310, 322

19   (2011) (quoting Cal. Bus. & Prof. Code § 17200).  "Because the statute is written in

20   the disjunctive, it is violated where a defendant's act or practice is (1) unlawful, (2)

21   unfair, (3) fraudulent, or (4) in violation of section 17500," *i.e.*, the FAL.  *Lozano v.*

22   *AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).  The FAL "makes it

23   unlawful for any person to 'induce the public to enter into any obligation' based on a

24   statement that is 'untrue or misleading, and which is known, or which by the exercise

25   of reasonable care should be known, to be untrue or misleading.'"  *Davis*, 691 F.3d at

26

27        [10]     Notably, in the real estate channel, which comprises approximately 50%
28   of all sales, the plans are more often purchased by the home seller or real estate agent.
     (*See* Hand Decl. at ¶ 25.)

1161 (quoting Cal. Bus. & Prof. Code § 17500).  Each prong of the UCL is a "separate
and distinct theory of liability."  *Lozano*, 504 F.3d at 731.

Under the FAL, whether an advertisement is "misleading" must be judged by
the effect it would have on a "reasonable consumer," who is the "ordinary customer
acting reasonably under the circumstances."  *Davis*, 691 F.3d at 1161-62 (citing
*Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008); *Colgan v.
Leatherman Tool Grp., Inc*., 135 Cal. App. 4th 663 (2006); *Lavie v. Procter & Gamble
Co*., 105 Cal. App. 4th 496 (2003)).  To prevail under this standard, a plaintiff must
show that members of the public are likely to be deceived by the advertisement.  *Id*.
at 1162 (citing *Williams*, 552 F.3d at 938); *see also In re Tobacco II Cases*, 46 Cal.
4th at 312.  This standard encompasses "not only advertising which is false, but also
advertising which[,] although true, is either actually misleading or which has a
capacity, likelihood or tendency to deceive or confuse the public."  *Id.* (quoting
*Williams*, 552 F.3d at 938).  In determining whether a statement is misleading, a court
looks primarily to the words of the statement itself, and compares those words to the
actual facts.  *Viggiano v. Hansen Natural Corp*., 944 F. Supp. 2d 877, 885-86 (C.D.
Cal. 2013) (citing *Colgan*, 135 Cal. App. 4th at 679).  Statements that amount to "mere
puffery," however, are not actionable, because no reasonable consumer relies on
puffery.  *See Williams*, 552 F.3d at 939, n. 3; *Cook, Perkiss and Liehe, Inc. v. N. Cal.
Collection Serv., Inc*., 911 F.2d 242, 246 (9th Cir. 1990); *Abramson v. Marriott
Ownership Resorts, Inc*., --- F. Supp. 3d ----, 2016 WL 105889, at *7 (C.D. Cal. Jan.
4, 2016).

To be "unlawful" under the UCL, the advertisements must violate another
"borrowed" law.  *Davis*, 691 F.3d at 1168 (citing *Cel-Tech Commc'ns, Inc. v. L.A.
Cellular Tel. Co*., 20 Cal. 4th 163, 180 (1999)).  A business practice is "fraudulent"
under the UCL if members of the public are likely to be deceived.  *Id*. at 1169; *see*

1   *also In re Tobacco II Cases*, 46 Cal. 4th at 312.[11]  As with the FAL, the challenged

2   conduct is judged by its effect on the "reasonable consumer." *Davis*, 691 F.3d at 1169.

3   Any violation of the FAL necessarily violates the UCL.  *Williams*, 552 F.3d at 938

4   (citing *Kasky v. Nike, Inc*., 27 Cal. 4th 939, 950-51 (2002)).

5        The UCL does not define the term "unfair," thus "the proper definition of

6   'unfair' conduct against consumers 'is currently in flux' among California courts."

7   *Davis*, 691 F.3d at 1169 (citing *Lozano*, 504 F.3d at 735).  For suits brought by

8   consumers, courts have applied either the balancing test set forth in *S. Bay Chevrolet*

9   *v. Gen. Motors Acceptance Corp*., 72 Cal. App. 4th 861 (1999), the test set forth in

10  *Cel-Tech*, or the three-pronged test set forth in the FTC Act.  *Id*. at 1169-70.  However,

11  the Ninth Circuit has declined to apply the FTC standard to consumer actions "in the

12  absence of a clear holding from the California Supreme Court" that it should be

13  applied.  *Lozano*, 504 F.3d at 736.

14       Under the balancing test, "unfair" conduct occurs when that practice "offends

15  an established public policy or when the practice is immoral, unethical, oppressive,

16  unscrupulous or substantially injurious to consumers."  *Id*. at 1169 (citing *S. Bay*

17  *Chevrolet*, 72 Cal. App. 4th at 886-87).  "Under this approach, courts must examine

18  the practice's impact on its alleged victim, balanced against the reasons, justifications

19  and motives of the alleged wrongdoer.  In short, this balancing test must weigh the

20  utility of the defendant's conduct against the gravity of the harm to the alleged victim."

21

22  _____

23  [11]     The fraudulent business prong of the UCL is distinct from common law
    fraud, both in its elements and its remedies.  *In re Tobacco II Cases*, 46 Cal. 4th at

24  312.   "Unlike common-law fraud claims that focus on the victim's reliance or
    damages, the UCL focuses on the perpetrator's behavior: 'to state a claim under the

25  UCL or the [FAL] . . . it is necessary only to show that members of the public are
    likely to be deceived.'  *Berger*, 741 F.3d at 1068 (citing *In re Tobacco II Cases*, 46

26  Cal. 4th at 312).  "Actual falsehood, the perpetrator's knowledge of falsity, and
    perhaps most importantly, the victim's reliance on the false statements – each of which

27  are elements of common-law fraud claims – are not required to show a violation of

28  California's UCL."  *Id*. (citing *In re Tobacco II Cases*, 46 Cal. 4th at 312).

*Id.* (internal citations and quotations omitted).   Under the *Cel-Tech* test, which was expressly limited in *Cel-Tech* to actions by competitors, but has been applied by courts to consumer actions, an "unfair" practice means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."   *Id.* at 1169-70 (citing *Cel-Tech.*, 20 Cal. 4th at 187 & n. 12).

Under both the UCL and FAL, damages cannot be recovered; rather, plaintiffs are limited to injunctive relief and restitution.   *See* Cal. Bus. & Prof. Code §§ 17203, 17535; *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003); *In re Tobacco II Cases*, 46 Cal. 4th at 312; *Chern v. Bank of Am.*, 15 Cal. 3d 866, 875 (1976); *Viggiano*, 944 F. Supp. 2d at 886; *Colgan*, 135 Cal. App. 4th at 695.   Under the UCL, "the primary form of relief available . . . to protect consumers from unfair business practices is an injunction, along with ancillary relief in the form of such restitution 'as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.'"   *In re Tobacco II Cases*, 46 Cal. 4th at 319 (citing Cal. Bus. & Prof. Code § 17203).

a.   *Fraudulent/False Advertising (FAL) Prongs*

"[C]lass certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue."   *Berger*, 741 F.3d at 1068 (citing *Stearns*, 655 F.3d at 1020-21; *Mazza*, 666 F.3d at 595-96); *see also Campion v. Old Republic Home Protection Co., Inc.*, 272 F.R.D. 517, 534 (2011) (citing *Pfizer, Inc. v. Super. Ct*., 182 Cal. App. 4th 622, 631 (2010)) ("[O]ne who was not exposed to the alleged misrepresentation and therefore could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution."); *Cohen v. DirecTV*, 178 Cal. App. 4th 966, 980 (2010) ("[W]e do not understand the UCL to authorize an award for injunctive relief and/or restitution on

behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice.")  Common issues do not predominate where there is "no cohesion among the [class] members because they were exposed to quite disparate information from various representatives of defendant."  *Stearns*, 655 F.3d at 1020; *see also Cohen*, 178 Cal. App. 4th at 979 (affirming denial of class certification under the UCL where the evidence demonstrated that the class "would include subscribers who never saw DIRECTV advertisements or representations of any kind before deciding to purchase the company's HD services, and subscribers who only saw and/or relied upon advertisements that contained no mention of technical terms regarding bandwidth or pixels, and subscribers who purchased DIRECTV HD primarily based on word of mouth or because they saw DIRECTV's HD in a store or at a friend's or family member's home").

For the same reasons discussed above, the Court finds Plaintiffs have failed to demonstrate that there was cohesion among class members as to how they were exposed – if they were even exposed at all – to the various alleged false and misleading representations.  As in *Campion*, "the proposed class members may have seen some, all or none of [the alleged misrepresentations] prior to the purchase of their home warranty plans due to the varying ways in which they acquired their plans."  *See Campion*, 272 F.R.D. at 536-37.  Again, although the named Plaintiffs experiences are not determinative in this context, their stories highlight the lack of cohesion among potential class members, as they were exposed to disparate information  from a variety of sources, and not all of them were even exposed to the alleged false and misleading representations prior to purchase.

b.    *Unlawful Prong*

Plaintiffs seek to certify a class under the unlawful prong of the UCL premised on a violation of the FAL and a violation of California Insurance Code section 12760, and presumably the alleged fraud.  (Mot at p. 14.)  Because Plaintiffs have failed to establish that class certification is appropriate with respect to its FAL and fraud claims,

1  the Court finds Plaintiffs have not met their Rule 23 burden with respect to the

2  unlawful prong of the UCL.

3      In addition, the Court finds that the Consolidated Class Action Complaint does

4  not reference a violation of California Insurance Code section 12760.  As Defendant

5  points out, prior judges in this case similarly did not locate such a violation in prior

6  versions of Plaintiffs' complaint.  (*See* Opp. at pp. 19-20, n. 10 (citing ECF Nos. 76,

7  87, 94, & 104).)  Plaintiffs cite no authority permitting them to seek certification of a

8  claim not in the complaint, and do not respond to Defendant's argument that they

9  should not be allowed to do so.  Accordingly, the Court declines to certify a class

10  based on this claim.

c.    <em>Unfair Prong</em>

12      In attempting to certify a class under the unfair prong of the UCL, Plaintiffs

13  simply argue that "[t]he evidence referenced above can establish a UCL violation

14  under the 'unfair' . . . prong[]." (Mot at p. 14.)  The Court finds that Plaintiffs have

15  failed to meet their burden with respect to the unfair prong of the UCL.

16  **B.    Superiority**

17      "Plaintiffs must also demonstrate that a class action is 'superior to other

18  available methods for fairly and efficiently adjudicating the controversy.'"  *Otsuka v.*

19  *Polo Ralph Lauren Corp.*, 251 F.R.D. 439, 448 (2008) (citing Fed. R. Civ. P.

20  23(b)(3)).  "Where classwide litigation of common issues will reduce litigation costs

21  and promote greater efficiency, a class action may be superior to other methods of

22  litigation," and it is superior "if no realistic alternative exists." *Valentino v. Carter-*

23  *Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996).  The following factors are

24  pertinent to this analysis:

(A) the class members' interest in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs argue that "[e]ach of the pertinent Rule 23(b)(3) factors, along with the overarching concern for judicial economy, supports class certification in this case." (Mot. at p. 24.)  Defendant does not contest superiority under the superiority requirement.   However, several of Defendant's arguments are relevant to the superiority analysis.

For the reasons set forth in the Court's discussion above of the propriety of certifying a nationwide class, the Court finds that the Class, as proposed, is not the superior means of resolving this case.  In addition, the Court finds there will likely be difficulties in managing this class action.  Defendant addresses this concern under the ascertainability requirement, but it is more appropriately addressed in terms of manageability.

The manageability requirement "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Among other considerations, "[t]his 'manageability' requirement includes consideration of the potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages." *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990) (citation omitted).  In sum, "when the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Zinser*, 253 F.3d at 1192 (citations omitted).   The Court has several significant qualms about the manageability of this case.

Plaintiffs' proposed Class includes all persons who purchased or were listed as the named insured on a First American home protection contract.  (*See* Mot. at pp. 2,

16, n. 8.)   There does not appear to be any dispute that First American maintains records for all persons listed as the named insured on a First American home protection contract.   However, as all parties acknowledge, the person who is listed on the contract is not necessarily the purchaser of the contract.   For the plans purchased through a real estate transaction, which comprise approximately 50% of all plans at issue, it is apparent that determining who purchased the plan will be time-consuming and difficult.

According to First American, once escrow on a home purchase has closed, First American receives payment for the home warranty contract, typically a check drawn on the escrow account.   (Miles Decl. at ¶ 4.)   However, First American does not receive a copy of the underlying real estate purchase agreement, and has no way of knowing whether the buyer or seller agreed to pay for the premiums.   (*Id*. at ¶ 4.)   For the named Plaintiffs in this case, in order to determine who purchased the plan, First American had to subpoena the escrow records.   However, the records do not always reflect who purchased the contract.   Accordingly, for a potentially large portion of the proposed Class, there will be significant difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages.

Plaintiffs also assert that their claims can be proven with common evidence. Among Plaintiffs' claims is that First American's contractors routinely gouge customers for non-covered portions of warranty replacements and upsell customers for repair and replacements that are not covered under the class members' home warranty plan, and that class members pay significant sums out of pocket to contractors above and beyond Defendant's fees.   (Consol. Compl. at ¶¶ 64, 109.)   As both parties agree, however, Defendant does not maintain its contractors' records and does not maintain records on how much its contractors charge customers outside of their covered plan.   (*See id*.; *see also* Miles II Depo. at 73:2-20, 77:3-10, 94:5-95:12, 106:10-11, 117:14-16; Horne Depo. at 186:8-23, 187:2-6, 213:4-20; Bottini Decl. at Exh. 50.)   Although these records may be able to be obtained from Defendant's

1  contractors, this presents a manageability concern.  The Court also has concerns about

2  Defendants' ability to prove that First American routinely denies claims for pre-

3  textual reasons and routinely denies claims with pre-existing conditions without

4  dragging every contractor into Court.[12]

5       For the foregoing reasons, the Court finds that Plaintiffs have failed to

6  demonstrate that this class action is manageable and the superior method of resolving

7  this case.

8  **C.    Certification Under Rule 23(b)(2)**

9       Under Rule 23(b)(2), a class may be certified where "the party opposing the

10  class has acted or refused to act on grounds that apply generally to the class, so that

11  final injunctive relief or corresponding declaratory relief is appropriate respecting the

12  class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Class certification under Rule 23(b)(2)

13  is appropriate only where the primary relief sought is declaratory or injunctive."

14  *Zinser*, 253 F.3d at 1195 (citing *Nelsen v. King Cnty.*, 895 F.2d 1248, 1254–55 (9th

15  Cir. 1990); *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 377 (C.D. Cal. 1997);

16  *Haley v. Medtronic*, 169 F.R.D. 643, 657 (C.D. Cal. 1996)).  A class seeking monetary

17  damages may be certified pursuant to Rule 23(b)(2) only where such relief is "merely

18  incidental to [the] primary claim for injunctive relief."  *Probe v. State Teachers' Ret.

19  Sys.*, 780 F.2d 776, 780 (9th Cir. 1986); *see also Wal-Mart*, 131 S. Ct. at 2557 (holding

20  that claims for monetary relief may not be certified under Rule 23(b)(2) "where . . .

21  the monetary relief is not incidental to the injunctive or declaratory relief.")

22  Moreover, Rule 23(b)(2) "does not authorize class certification when each class

23  member would be entitled to an individualized award of monetary damages."  *Wal-

24  Mart*, 131 S. Ct. at 2557.

25       Although Plaintiffs' claim they "primarily" seek certification under Rule

26  23(b)(3) for monetary relief, including damages, "because they also seek a class-wide

27

28

[12]    This concern also implicates the predominance requirement.

injunction to end Defendant's unlawful practices," they contend Rule 23(b)(2) certification is also appropriate.  (Mot. at p. 16, n. 8.)  "Because Rule 23(b)(2) certification is inappropriate where the primary relief sought is monetary, . . . the dispositive question is: What type of relief does [the plaintiff] primarily seek?" *Zinser*, 253 F.3d at 1195 (citing *Nelsen*, 895 F.2d at 1254).  The primary relief sought in this case is monetary, with each class member entitled to an individualized award of monetary damages.  (*See* Mot. at pp. 20-22 (Plaintiffs' proposed calculation of damages)).  Accordingly, the Court does not find Rule 23(b)(2) appropriate.

Moreover, "[u]nless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).  "Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." *Bates v. United Parcel Serv., Inc*., 511 F.3d 974, 985 (9th Cir. 2007) (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc*., 528 U.S. 167, 185 (2000)).  The fact that the named Plaintiffs previously purchased First American plans and may bring a claim for damages therefore does not in itself grant them standing to seek injunctive relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (stating that in a claim for injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy").  In order to establish standing to seek an injunction, a plaintiff must face an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  In other words, "he or she must demonstrate a 'very significant possibility of future harm.'" *In re Static Random Access memory (SRAM) Antitrust Litig*., 264 F.R.D. 603, 610 (N.D. Cal. 2009) (quoting *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996)).

Here, the named Plaintiffs do not currently have First American plans.  (*See* Miles Decl. at ¶¶ 14, 16, 19, 21; Shophet Decl. at Exh. CC at 14:20-22.)  Carrera's

plan expired in February 2010, Morrison's and Hershey's final plans expired in May 2013, Jullien's final plan expired in October 2012, and Diaz testified she did not have a plan as of January 2011.  (*See id.*)  Although renewal is possible, there is no allegation or testimony suggesting that any of the named Plaintiffs intend to purchase a First American plan in the future.  Thus, Plaintiffs have failed to establish that they face an "actual or imminent" injury.  For this reason as well, the Court denies Plaintiffs' request to certify a Rule 23(b)(2) class in the alternative.

## V.     MOTION TO STRIKE AND FOR SANCTIONS

Plaintiffs filed a motion to strike and for sanctions in connection with four reports Defendant attaches to its motion for class certification.  (ECF No. 132 ("Strike Mot.").)  Plaintiffs seek to exclude from evidence the four reports prepared by Defendant's expert, W. John Irwin II, because Defendant withheld these reports, as well as all corresponding notes and communications, from Plaintiffs during discovery and did not supplement its discovery responses upon determining that Mr. Irvin was going to be used as an expert.  (Strike Mot. at p. 1.)  The reports relate to inspections Mr. Irvin, a licensed Professional Mechanical Engineer, conducted on Plaintiffs' properties.

### A.     Background

With respect to this motion, the following facts do not appear to be disputed:

- Defendant designated Mr. Irwin as an expert that it may use at trial pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) in the Diaz Action.  (ECF No. 133 ("Strike Opp.") at p. 3; Strike Mot. at p. 4.)
- Plaintiffs' counsel deposed Mr. Irwin on July 5, 2011 in the Diaz Action.  (Strike Opp. at p. 3.)
- After Hershey, Jullien, and Morrison joined Carrera as Plaintiffs in the Carrera Action, Mr. Irwin inspected their properties.  (Strike Opp. at pp. 5-6; Strike Mot. at p. 4.)
- On November 21, 2013, Plaintiffs served a Request for Production

("RFP") seeking all documents "concerning [First American's] physical inspection of Plaintiffs' properties" including all reports, retainer agreements, and communications.  (Strike Opp. at p. 6; Strike Mot. at p. 4.)

- As of the date of the request, the Court had not yet issued a Scheduling Order setting a deadline for designating experts.  (Strike Opp. p. 6; ECF No. 92.)

- Because Mr. Irwin was still acting as a consultant in the Carrera Action, First American timely objected to the RFP, asserting the attorney work product doctrine, as codified in Rule 26(b)(3).  (Strike Opp. at p. 6; Strike Mot. at p. 5.)

- Defendant produced Mr. Irwin's handwritten notes and photographs from his inspections of the properties.  (Strike Mot. at p. 5, n. 7; Strike Opp. at pp. 6-7; ECF No. 134 ("Strike Reply") at p. 3.)

- The Scheduling Order in the Carrera Action did not set the deadline for designating experts until after class certification briefing was completed. (Strike Opp. at p. 7.)  The deadline was March 20, 2015 for initial designation.  (ECF No. 92 at ¶ 2; *see also* ECF No. 109 at ¶ 4.)

- Defendant attached the four reports at issue to its opposition to Plaintiff's motion for class certification.  (Strike Mot. at p. 6; Strike Opp. at p. 7.)

- The Irwin reports address the specifics of each named Plaintiff's home warranty claims.  (Strike Mot. at p. 6; Strike Opp. at p. 8.)

- After Defendant attached the reports to its opposition, Plaintiffs did not seek to depose Mr. Irwin.  (Strike Opp. at p. 8; Strike Reply at p. 9.)

- In their reply brief in support of class certification, Plaintiffs assert that "Plaintiffs [home warranty] claims and this motion [for class certification] have nothing to do with whether First American properly rejected [home warranty] claims or what portion of claims were approved

13cv1585

of denied."  (Strike Opp. at p. 8; Reply at p. 1, lines 9-11.)

## B.    Legal Standard

Under Rule 26(b)(4), a party may employ two types of experts: (a) those experts identified as "an expert whose opinions may be presented at trial," which the Court will refer to as a "testifying" expert; and (b) experts "retained or specially employed . . . in anticipation of litigation or to prepare for trial and who [are] not expected to be called as a witness at trial," which the Court will refer to as a "non-testifying" or "consulting" experts.  Fed. R. Civ. P. 26(b)(4)(A), (D).  A party must disclose the identity of a testifying expert "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(A), (D).  If the testifying expert is "one retained or specially employed to provide expert testimony in the case," the disclosure must include a report.  Fed. R. Civ. P. 26(a)(2)(B).  Any draft of such a report is protected from disclosure, as are certain communications between the party's attorney and the testifying expert. Fed. R. Civ. P. 26(b)(4)(C).  A party may depose a testifying expert only after the expert report is provided.  Fed. R. Civ. P. 26(b)(4).

With respect to non-testifying or consulting experts, a party may "discover facts known or opinions held by" such an expert only "as provided in Rule 35(b)" or "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means."  Fed. R. Civ. P. 26(b)(4)(D); *see also Downs v. River City Grp., LLC*, 288 F.R.D. 507, 510-14 (D. Nev. 2013); *Estate of Manship v. United States*, 240 F.R.D. 229 (M.D. La. 2006).  In addition, "[w]hen experts serve as litigation consultants, the work-product privilege generally applies to materials reviewed or generated by them in that capacity." *S.E.C. v. Reyes*, No. c 06-04435 CRB, 2007 WL 963422, at *1 (N.D. Cal. 2007) (citing Fed. R. Civ. P. 26(b)(3)); *see also Apple Inc. v. Amazon.com, Inc*., No. 11-1327 PJH(JSC), 2013 WL 1320760, at *1 (N.D. Cal. Apr. 1, 2013).

## C.    Discussion

Plaintiffs argue Defendant was required to supplement its response to the RFP

after it determined it was using the Irwin reports in support of its opposition to Plaintiffs' motion for class certification.  Pursuant to Rule 26(e)(1)(A), "[a] party . . . who has responded to [a] . . . request for production . . . must supplement or correct its . . . response . . . in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  A party who fails to provide the information required by Rule 26(e) "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Instead of this sanction, a court, on motion and after giving an opportunity to be heard, may order the payment of reasonable expenses, including attorney's fees, caused by the failure. Fed. R. Civ. P. 37(c)(1)(A).  The burden is on the party facing sanctions to prove that its violation was either substantially justified or harmless.  *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

Specifically, Plaintiffs argue that Defendant was obligated to timely supplement in response to the RFP "[o]nce Defendant decided to use Mr. Irwin as an 'expert' in addition to a 'consultant.'"  (Strike Mot. at p. 9.)  Plaintiffs offer two theories as to when this occurred.  First, Plaintiffs contend that Mr. Irwin was retained as an expert on November 29, 2012, when he was first retained for the Carrera Action.  (*Id*. at p. 15.)  Alternatively, Plaintiffs contend that – "[e]ven assuming Defendant initially retained Mr. Irwin solely as a 'consultant'" in the Carrera Action – Defendant was under the obligation to timely supplement its response to the RFP once Defendant decided to use Mr. Irwin as an expert.  (*Id*. at p. 16.)  Plaintiffs suggest this date was December 4, 2014, which is the date of Mr. Irwin's report on his inspection of the Hershey property.  (*Id*.)  Plaintiffs further claim they were surprised by the filing of the Irwin reports, the surprise cannot be cured, and providing the documents now would require re-briefing of the motion for class certification.  (*Id*. at pp. 19-20.)

In response, Defendant argues that it was under no legal obligation to disclose to Plaintiffs, in advance of its deadline to designate experts, which expert declarations First American's counsel had decided and intended to file in support of its opposition to Plaintiffs' motion for class certification. After it filed the declaration of Mr. Irwin, Defendant concedes that it waived certain attorney-work product protections and opened the door to Mr. Irwin's deposition. For the following reasons, the Court agrees with Defendant.

Defendant designated Mr. Irwin as an expert in the Diaz Action and Plaintiffs were able to take his deposition. In the Carrera Action, however, Defendant claims it initially retained Mr. Irwin as a non-testifying expert. Therefore, under the work product doctrine of Rule 26(b)(3)(A) and the protection afforded non-testifying experts under Rule 26(b)(4)(D), Plaintiffs were not entitled to discover the facts known or opinions held by Mr. Irwin absent a showing of exceptional circumstances. The consolidation of these cases did not automatically render Mr. Irwin an expert in the Consolidated Action. The Court set the deadline to designate experts in the Consolidated Action for March 20, 2015. (*See* ECF No. 92 at ¶ 2; *see also* ECF No. 109 at ¶ 4.) Plaintiffs were under no obligation to designate Mr. Irwin prior to that date.

Although the deadline to designate testifying experts did not occur until after Defendant's opposition to the motion for class certification was due, when Defendant submitted an expert declaration on behalf of Mr. Irwin with its opposition, the case law is clear that Defendant opened up discovery on Defendant's statements, findings, and opinions, and entitled Plaintiffs to take Mr. Irwin's deposition about the subject of his testimony. *See Worley v. Avanquest N. Am. Inc.*, No. C 12-04391 WHO(LB), 2013 WL 6576732, at *4 (N.D. Cal. Dec. 13, 2013); *Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-cv-2226 SI(KAW), 2013 WL 1402337, at *2 (N.D. Cal. Apr. 5, 2013) (citing *Sims v. Metro. Life Ins. Co.*, No. C–05–02980, 2006 WL 3826716, at *2 (N.D. Cal. 2006)). However, submitting Mr. Irwin's declaration does not permit

1   discovery of information or material not put at issue or of the contents of any
2   privileged communications.  *Worley*, 2013 WL 6576732, at *4.

3          Plaintiffs did not seek to depose Mr. Irwin after Defendant filed his declaration.
4   Instead, they seek to sanction Defendant for not supplementing its response to their
5   RFP.  To the extent Defendant failed to supplement its response to the RFP in a timely
6   manner, the Court finds that a sanction is not appropriate, as the failure was harmless.
7   *See* Fed. R. Civ. P. 37(c)(1).  As Plaintiffs state in their reply in support of their motion
8   for class certification: "Plaintiffs' claims and this motion have nothing to do with
9   whether First American properly rejected claims or what portion of claims were
10  approved or denied."  (Reply at p. 1, lines 9-11.)  Moreover, as is apparent from this
11  Order, the Court did not – and did not need to – rely on Mr. Irwin's declaration or
12  reports in deciding this motion.  The Court further does not find that a sanction in the
13  form of attorney's fees is appropriate.  Accordingly, Plaintiffs' motion for sanctions
14  is **DENIED**.

15  **VI.    CONCLUSION**

16         For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for class
17  certification (ECF No. 121); **DENIES** the *ex parte* motions regarding supplemental
18  authority filed by the parties (ECF Nos. 139, 145, 146); and **DENIES** Plaintiffs'
19  motion for sanctions (ECF No. 132).

20         **IT IS SO ORDERED.**

21
22  **DATED:  February 22, 2016**
23                                                          Hon. Cynthia Bashant
                                                            United States District Judge
24
25
26
27
28